[CONSTITUTIONAL LAW.]

BROWN and Others, Plaintiffs in Error, *against* The STATE OF MARYLAND, Defendant in Error.

An act of a State legislature, requiring all importers of foreign goods by the bale or package, &c. and other persons selling the same by wholesale, bale, or package, &c. to take out a license, for which they shall pay 50 dollars, and in case of neglect or refusal to take out such license, subjecting them to certain forfeitures and penalties, is repugnant to that provision of the constitution of the United States, which declares, that " no State shall, without the consent of Congress, lay any impost, or duty on imports or exports, except what may be absolutely necessary for executing its inspection laws ;" and to that which declares that Congress shall have power " to regulate commerce with foreign nations, among the several States, and with the Indian tribes."

ERROR to the Court of Appeals of Maryland.

This was an indictment in the City Court of Baltimore, against the plaintiffs in error, upon the second section of an act of the legislature of the State of Maryland, passed in 1821, entitled, "An act supplementary to the act laying duties on licenses to retailers of dry goods, and for other purposes." The second section of the act provides, " That all importers of foreign articles, or commodities, of dry goods, wares, or merchandises, by bail or package, or of wine, rum, brandy, whiskey, and other distilled spirituous liquors, &c. and other persons selling the same by whole-

sale, bale, or package, hogshead, barrel, or tierce, shall, be·
fore they are authorized to sell, take out a license as by the
original act is directed, for which they shall pay fifty dollars ;
and in case of neglect or refusal to take out such license,
shall be subject to the same penalties and forfeitures as are
prescribed by the original act, to which this is a supple-
ment." The penalties and forfeitures prescribed by the
original act, which was passed in 1819, were, a forfeiture of
the amount of the license tax, and a fine of 100 dollars, to
be recovered by indictment.

The defendants having demurred to the indictment, a
judgment was rendered upon the demurrer against them, in
the City Court, which was affirmed in the Court of Appeals,
and the case was brought, by writ of error, to this Court.

*Feb. 28th.*    Mr. *Meredith*, for the plaintiffs in error, contended, that
the law in question was an unconstitutional exercise of the
taxing power of Maryland.  He did not deny the existence
of such a power.   As a necessary incident to sovereignty,
it belonged to the several States before the adoption of the
constitution, and it still belongs to them, subject, however,
to the restrictions imposed upon its exercise by the para-
mount authority of that instrument.   With regard to these
restrictions, he did not mean to contend. that the general
grant contained in the eighth section of the first article of
the constitution, vested in the national government any
thing more than a concurrent power of taxation.   He ad·
mitted the rule of construction, that a grant of power to
Congress does not, of itself, imply a prohibition of its exer-
cise by the States.   The powers granted to the general go-
vernment are never to be considered as exclusive, unless
they are made so in express terms, or unless, from the na-
ture of the power itself, its concurrent exercise must neces-
sarily produce direct repugnancy or incompatibility.   But
he argued, that this was by no means the inevitable result
from a concurrent exercise of the taxing power, because its
peculiar nature rendered it often capable of being exercised
by different authorities at the same time, and even upon the
same subject, without actual collision or interference.

The restrictions which he had alluded to, were to be found

in other provisions of the constitution; and they were both express and implied. The former were all comprised in the tenth section of the first article, by which the States are prohibited, unless with the consent of Congress, from laying any imposts or duties on imports or exports, except what may be absolutely necessary for executing their inspection laws; and are, also, without such consent, forbidden to impose any duty upon tonnage. The effect of this prohibition, coupled with the general grant of the taxing power before referred to, is to vest in the national government an exclusive right to the commercial imposts of the country. With the exception of these, however, the power to lay and collect taxes is a concurrent power.

But, like all the other concurrent powers of the States, this power of taxation is subject, in its exercise, to that general implied restriction which necessarily results from the supreme and paramount authority of the Union. This is a vital principle of the political system, and its direct operation is to restrain the States from the exercise of any power repugnant to, or incompatible with, the constitution, or the constitutional laws of the national government. By which is to be understood, not merely a repugnancy growing out of a concurrent exercise of the same power by Congress and a State legislature, but that which may arise from the exercise of one power by a State, with reference to a different power, whether exclusive or concurrent, express or implied, residing in the general government.

Having stated and illustrated these as the constitutional limits of the taxing power of the States, he insisted, that they had been transgressed by the legislative act under consideration. The second section comprises all the provisions of the law which are material to the question. The true construction of this section is somewhat doubtful; upon any interpretation, however, it prohibits the importer from selling the imported merchandise without having first taken out a license to do so, for which he is required to pay a stipulated tax.

The question then is, whether this is such a law as the legislature of Maryland have a right to pass. Under colour of a license law, he contended that this statute was a palpable

evasion of the express restriction upon the States to "lay duties on imports;" an indirect attempt to do that which the constitution has explicitly inhibited. And he said this, because he thought it might be clearly shown, that a law, laying a tax on the importer for the privilege of selling the merchandise he has himself imported, which is this law, and this case, is equivalent, in all substantial respects, to a duty on imports, since, with a few slight and unimportant differences, it answers all the purposes, and produces all the effects of a concurrent power in the States to impose such a duty.

What are the apparent differences between this and a tax directly on imports? It may be said, in the first place, that the one is a tax for the privilege of bringing the foreign article into the country, and the other a tax for the privilege of selling it after it is so brought in. But these privileges are indissolubly connected; the right to sell is a necessary incident to the right of importing. The grant of a privilege to import would be of no value, unless it implies a right to sell. Prohibit sale, and importation necessarily ceases. He maintained that, on a fair and just construction of the whole revenue system, the implication was irresistible. That the duties exacted by the general government were paid, not for the privilege to import simply, but for the privilege of importing foreign commodities, and using them in the way of merchandise, might be incontestably proved, by showing that no goods were dutiable, unless imported with the intention, and for the purpose of traffic. With this view, he referred to various provisions of the act of March, 1799, (ch. 128. s. 30. 32. 45, 46. 60. and 107.) and to the case of the *Concord.*[a] This is the principle, also, of the English law of customs, from which our system is mainly borrowed.[b] It was likewise worthy of remark, that the legislation of Maryland, upon this subject, before the adoption of the constitution, was in strict accordance with the same principle, and carried it so far as to permit the merchant to try the market by an actual sale, and paying the duties only on the

a  9 *Cranch,* 388.  See also 4 *Cranch,* 347.
b  *Hale on the Customs,* Pt. 3. ch. 20. in *Hargr. Law Tracts,* 211.

portion sold, to export the residue free of duty.[a]   There is, then, no difference in this respect between these two modes of taxation.

It may be said that these taxes are payable at different times; in the one case, at the time of importation, in the other, at the time of sale.   But if they are both paid substantially for the same privilege, surely this is not a material difference.   It is a matter that simply concerns the safety, certainty, and convenience of collection ; but it gives no distinctive character to the law.   In point of fact, however, the duty imposed by the revenue system is not payable, except it is less than fifty dollars, until after the importation.

A third apparent difference may be said to consist in this : that the import duty is a charge upon the goods, the license upon the person ; but the one is as much a charge upon the goods as the other, if by that is meant an increase of their actual cost.   The import duty is, however, a personal charge upon the importer ; it is not the bond that alone makes him personally liable ; without having given a bond, he is still answerable for the duties.[a]

These are the only differences in the operation of the two taxes, and they are apparent, but not substantial ; they are the disguise thrown about the law to elude detection. The true test, however, is, to consider the effect of this law upon the exclusive grant to the general government, to raise revenue from imposts.   The reasons for such a grant are obvious.   The objects committed by the constitution to the general government are of immense magnitude, and require corresponding means.   Of all species of taxation, that upon imports is most fruitful and least oppressive.   It is sound policy, therefore, to cherish and extend this branch of the public revenue ; because, whenever it fails, other modes of taxation must necessarily be resorted to of a more odious and oppressive nature.   Now, the consequence of the right claimed by this law on the part of Maryland, is, to place this branch of the public revenue completely in her power ; as entirely so, as if she had constitutionally a concurrent right

a *Hanson's Laws of Maryland*, Act of 1783, ch. 86. s. 34. Act of 1784, ch. 84. s. 5.

b 1 *Mason's Rep.* 482.

1827.

Brown
v.
State of
Maryland.

to tax imports. It is to enable her, at her pleasure, by means of license laws, to annihilate, as it regards her own territory, the commercial revenues of the country. What is to prevent her from prohibiting altogether the importation of foreign merchandise into any of her ports? It is only to increase the price of the license until the commodity will no longer bear the burden, and the end is accomplished. Importation must, in that case, necessarily cease, and with it revenue. It is not pretended that these consequences are produced by this particular law; it is not necessary that this should be the case. We are not to look at the particular exercise of power so much as at the principle upon which the power is assert ed. We are not to judge of the constitutionality of this law by the amount of tax which it imposes; it is not the degree of taxation, in the particular instance, that determines the right to tax. That the public revenue is, to a certain degree, affected by the operation of this law, is incontestable. But if, on principle, Maryland has a right to demand fifty dollars as the price of a license to sell imported merchandise, she has a right to demand any sum for the same privilege. If, in other words, she is within the proper sphere of her taxing power, that power is, in its nature, unlimited, and she may carry it to what extent she pleases. A power to tax, this Court has emphatically said, is a power to destroy. In this case, it is a power to prohibit; a power to deprive the government of the means to accomplish its great objects, and conduct all its important operations; a power to defeat the intention of the exclusive grant of commercial revenue.

If Maryland has a right to enact laws of this description, she has a right to regulate her own foreign commerce, although, by the constitution, it is exclusively vested in Congress. The imposition of import duties is often resorted to, not for the purpose of revenue, but to regulate commercial intercourse with foreign countries. Discriminating duties, protecting duties, prohibitory duties, are so many commercial regulations. These may all be resorted to under the disguise of license laws. If Maryland has a right to pass general license laws, she may pass partial ones; she may select particular commodities, and burthen their sale with a license duty; she may establish a tariff of discriminating

duties for herself, and affect, if not defeat, the commercial policy of the country. In one word, she may exercise the same right to regulate commerce by means of license laws, which a concurrent power to tax imports would give her, and thus evade, in this respect also, the constitutional prohibition. It may be said, that this law looks to no such object; that it is simply a tax for revenue, and that there is no ground to apprehend that it will be used for any other purpose. But the motives for legislative acts are not fit subjects of judicial inquiry. If the power can be exercised for one purpose, it may be for another; the intention may always be effectually concealed. It is the principle of the law, and its capacity to be exerted for the attainment of other objects than that which it professes to aim at in the particular case, that it is proper and necessary to look to. If the States are authorized to pass laws of this description, the purposes which induced the prohibition are defeated, and it is rendered altogether nugatory.

Mr. *Taney* and Mr. *Johnson*, contra, insisted, that the law of Maryland did not lay a duty on imports, and was not repugnant to the constitution of the United States.

The act of assembly (they said) does not impose a tax on the importation of foreign goods, nor upon the trade and occupation of an importer. But the tax is imposed upon the trade and occupation of selling foreign goods by wholesale after they have been imported. It is a tax upon the profession or trade of the party, when that trade is carried on within the State. It is laid upon the same principle with the usual taxes on retailers, or innkeepers, or hawkers and pedlars, or upon any other trade exercised within the State. It is true, the importers of foreign goods are, by express words, made subject to the provisions of this law, provided they sell by wholesale; but it is the selling by wholesale which subjects the party to the tax; it is upon that trade that the tax is imposed.

Does the constitution of the United States forbid Maryland to impose such a tax? This is the only question presented by the record.

The plaintiffs in error insist, that the tax in question is virtually a duty on imports, and violates that clause in the constitution which declares that a State shall not lay duties on imports.

We answer, it is not, either directly or indirectly, a duty on imports. A duty on imports is a tribute paid to the sovereignty of the country for permission to introduce foreign goods. To import, and to bring in, mean the same thing.[a] A duty on imports is, therefore, a duty on the bringing in of foreign goods—on the act of importation. The duty is paid for the permission to introduce them; it is the consideration given for that privilege. The party buys the right to introduce the goods into the United States, and to place them under the protection of the laws of the country. He becomes liable to the whole duty by the very act of importation; and the amount is the same, whether he proposes to sell the goods, or to keep them for his own use, or to give them as a present to another.

After the goods have been brought into a State, the importer has one peculiar relation to them by reason of his being the importer. He is known to the State laws in the character of owner, or as the party entitled to the custody of the goods, and he receives the same degree of protection whether he be the importer or not the importer. The property, when it has passed through the custom houses, is no longer under the exclusive protection of the United States. It is guarded by the laws of the State—must be transferred and otherwise dealt with, according to the laws of the State. It is, therefore, imported, or brought in, and the act of importation is completed. If, therefore, a duty on imports means a duty on the act of importation, or the permission to introduce, it is very clear, that the law in question is not, directly or indirectly, a duty on imports.

But, it is said, that the word "imports," as used in the constitution of the United States, does not mean *importation*, but means the *goods imported*.

If this interpretation be right, then the constitution of the

a Act of March 2, 1799, ch. 128. 1 *Mason's Rep.* 499. 4 *Wheat. Rep.* 246.

United States must be expounded as if it had said, "*No*
*State shall, without the consent of Congress, lay any imposts*
*or duties on goods imported.*" And if such be the true
reading of the constitution, then no State can lay a tax
upon any article of property which was imported from a
foreign country. According to this construction, imported
plate, imported furniture, imported property of every kind,
would be privileged property, and exempt from taxation by
the States. For, if the word "*imports*," as used in the
constitution, means "goods imported," or "imported
goods," then the States, without the permission of Congress,
cannot tax property within their dominion, and owned by
their citizens, provided that property has been introduced
from abroad. Such would be the inevitable consequence
of expounding the word imports as if the words "*imported
goods*" had been used. The uniform practice of the
States, the principles of justice, the interests of the commu-
nity, are all directly opposed to this construction.

But, it is said, that if " imports" means importation, and
not the goods imported, yet the privilege of selling is inse-
parably incident to the importation, and is always implied
in the privilege to import. This argument, like the one
last replied to, will be found to prove too much, and to lead
to results that can hardly be acquiesced in.

The right to import foreign goods is derived from the
United States. The duties are imposed by the federal go-
vernment, and are paid to that sovereignty. The permis-
sion to import is conferred by that government, and if the
right to sell is implied in the permission to import, then the
right to sell is derived from the United States, and becomes
an absolute and vested right in the importer as soon as he
acquires the privilege of introducing the goods; that is, as
soon as he pays the duties, or secures them, according to
the acts of Congress. And if the right to sell is a vested
right, derived from the general government, then this right
cannot be limited, restrained, regulated, or in any manner
affected by State legislation. The importer, then, having
an absolute and unconditional right to sell, may sell in any
place, and in any manner he thinks proper. He may offer
for sale large quantities of gunpowder in the heart of a city,

and thus endanger the lives of the citizens; he may offer hides, fish, and articles of that description, in places offensive and inconvenient to the public, and dangerous to the health of the citizens; he may hold an auction at his own warehouse, and refuse to pay any tax to the State; he may sell at retail; he may sell as a hawker and pedlar; and the laws of the States which impose taxes on these trades, are unconstitutional and void, so far as the importer is concerned. Those taxes have been always imposed by some of the States, and their right to derive a revenue from these sources has never before been questioned.

It may be said, that the right of the importer to sell, is a right to sell by wholesale only, and not by auction, or by retail. If, however, the right exists at all, it cannot be limited to sales by wholesale. It is said to be incident to the permission to import; and if it be annexed to that permission, then it must be an absolute and unconditional right; for where can we find the qualification? If the States are disabled from imposing a tax on the sales of foreign merchandise, when made by the bale or package, why are they not equally unable to impose a tax on the sales of such goods when made by auction, or retail, or in any other manner? The constitution gives no peculiar privilege to any particular mode of sale; and this Court, in expounding the instrument, will not introduce into it new limitations, and new divisions of power, not implied by its words.

In fine, the importer, by the payment of the duties, either acquires the right to sell, as well as the right to introduce the goods, or he acquires the right to bring in merely.—In the first case, his right to sell would be beyond the reach of State control, and State regulation. In the second case, the goods would be subject to the laws and authority of the State. It can hardly be held, that an importer may sell in any place, and in any manner he pleases; and if he may not, it is because the disposition of the goods is subject to the regulations of the State authorities; and if they are so subject, they are, consequently, liable to such burthens as the State may impose on any particular mode of sale or transfer; and, therefore, liable to the tax in question.

The cases cited of goods wrecked on our shores, can

hardly be supposed to bear on this argument. To import, implies an act of the *will*, a voluntary introduction of the goods. Besides, in those cases, the question is, are the goods liable to pay duty ? not what rights will the payment of the duty procure ? And when the questions are so different, it is not perceived how a decision of the one can in any degree affect the other.

But, it is insisted. on the other side, that if the law in question be not repugnant to that clause in the constitution which forbids a State to lay a duty on imports, yet it is in violation of that clause which gives Congress the power to regulate commerce with foreign nations. It must be observed, that this argument admits, *argumenti gratia*, that the tax in question is not, either directly or indirectly, a duty on imports. But the plaintiffs in error contend, that although it be not a duty on imports, still the tax in question is forbidden by the constitution of the United States. In other words, they maintain, that the tenth section in the constitution of the United States is not the only one which limits the taxing power of the States ; and that this power is still further curtailed by the clause which gives Congress the power to regulate commerce.

It has been settled by the decisions of this Court, that the grant of a power to Congress, does not extinguish the right of the States to legislate on the same subject, unless Congress exercises the power granted. And. when the power is exercised. the States may yet legislate, if the whole ground of legislation has not been covered by the laws of the United States ; provided the State law be not repugnant to that of the federal government. Assuming these principles as settled, it would be a sufficient answer to this argument to say, that no law of Congress gives, or professes to give to the importer, the right to sell: The revenue laws referred to, charge duties in certain cases, where sales may be made. The laws are framed on the assumption that certain foreign goods will be permitted to be sold ; but these laws do not give that permission generally, nor point out in what mode they may be sold. If, therefore, under this power to regulate commerce, Congress may give the importer a right to sell, yet the right is not given ; and until it is given by Con-

gress, the States may regulate and tax the sales without violating the constitution of the United States.

But this clause in the constitution does not give to Congress the power contended for. By the constitution of the United States, the power of taxation by the States is restrained, by express words, in certain cases.

It has always been supposed, that these limitations of State sovereignty, in matters of revenue, so carefully and particularly set down, excluded all inference and implication, and left with the States all the powers of taxation not expressly denied to them in the restraining section. It is very clear, that the men who framed the constitution, and the people who adopted the constitution, so understood it. The *Federalist* must be considered as expressing the opinions of the friends of the federal constitution, both in and out of the Convention; and in No. 33, and near the conclusion of that number, the commentary on the subject of the taxing power is thus concluded: " The inference from the whole is, that the individual States would, under the proposed constitution, retain an independent and uncontrollable authority to raise revenue to any extent of which they may stand in need, *by every kind of taxation*, except duties on imports and exports." And, throughout No. 32 and No. 33 of the *Federalist*, the same principle is repeatedly asserted as a clear and indisputable one.

But, if Congress, under the power to regulate commerce, may authorize the importer to sell, then certain important powers of taxation, besides duties on imports and exports, have been surrendered by the States. For if Congress may give by law to the importer the right to sell, Congress may direct how the sale may be made, or may allow the importer to elect any mode he pleases; and, whenever this shall be done by the general government, the power of the States to regulate such sales is at an end, and, consequently, their power of taxation also. If this argument, then, be sustained by the Court, the authority of the States to regulate and to tax auctioneers and retailers is not " *an independent and uncontrollable authority*," as was supposed by the distinguished writers in the *Federalist*, but is a mere dependent authority, and liable to the control of Congress, so far as fo-

reign goods are concerned.  Congress, it is said, may give
the importer the right to sell. , If Congress may do so, then the States cannot tax any mode of sale which Congress may please to permit.  Such powers were surely too important and valuable to have been surrendered in this loose and slovenly manner.   If they were to have been given up by the States, they would have been given up in express terms, like the duties on imports, and not by vague and uncertain inferences.   Besides, if Congress may give the right to sell in any manner, they may also give the right to sell in any place ;  and the police laws of the different States, made for their safety or health, exist only by the permission of Congress.   And again, if Congress may not only prescribe the terms upon which foreign goods may be introduced into the country, but may direct how they shall be sold, and thus exempt the sales from State taxation, why may not Congress, upon the same principle, exempt all foreign goods from taxation by the States ?   If Congress may exercise exclusive dominion over foreign goods, for one purpose, after they have been brought into a State, why may not the same exclusive power be exercised for any other purpose ?   Reasons of policy might, indeed, make a difference ;  but we are not now discussing the policy of introducing new provisions into the constitution, but endeavouring to ascertain the meaning of the words used in the instrument.

The last argument urged in behalf of the plaintiff in error, is founded on the supposed policy and objects of the constitution, rather than on the interpretation of any words used in the instrument itself.   It is said, that if a State may impose the tax in question, it may increase it to any amount, and by that means the States may prevent importations altogether.   And, hence it is inferred, that a power capable of being so much abused, was not intended to have been left with the States.

Nothing can be more fallacious than to urge the possible abuse of power by the States, for the purpose of proving that the power has been taken away.  Such an argument goes to the destruction of all State power.  Such a principle of construction would put an end to all State authority ;  for all power may possibly be abused.  The States cannot and

ought not to be deemed more liable than the federal government to abuse the powers confided to them by the people; nor can any supposed and merely possible inconvenience, which might arise from an improper use of State power, furnish a ground for deciding against the existence of the power. We must be continually liable to this inconvenience from the complex character of our government. In the *Federalist*, No. 32, the rule of construction is thus stated : " It is not a mere possibility of inconvenience in the exercise of powers, but an immediate and constitutional repugnancy, that can, by implication, alienate and extinguish a pre-existing right of sovereignty." The possibility of inconvenience from the improper use of this power by the States, is not, therefore, any argument against the existence of this power. It cannot, by implication, alienate and extinguish the power for which we are contending.

But, indeed, it is impossible that the power to lay the tax in question can lead to any inconvenience, or can be used to embarrass the regulations, or lessen the revenue of the federal government. If the tax on wholesale dealers should be so heavy as to prevent importations, the people of the State will be the principal sufferers. If it enhances the price of imported goods, the burthen is at least as heavy on the people of the State as it is on the citizens of other States, and this furnishes abundant security that no such tax will ever be vexatiously laid. The people of a State cannot be justly suspected of imposing heavy burthens upon themselves, for the purpose of thwarting or embarrassing the general government. If, indeed, the people of a State could be guilty of such folly, they might, by bounties and other facilities to manufacturers in their own State, effectually prevent the importation of foreign goods. Nobody would deny that the States possess this power; but nobody suspects them of being disposed to abuse it.

There is, indeed, no real danger of serious inconvenience from these conflicting powers. The good sense and good feelings of the people will always apply the remedy; and we may safely confide, that the State governments, and the general government, will never embark in the unprofitable contest of trying which shall do each other the most harm. But

if such a state of things should ever take place, it would matter very little how the boundaries of power had been marked out by judicial decision. The Union cannot be preserved by the mere strength and power of the federal government. It is dissolved as soon as it shall forfeit the affection and confidence of the States.

The *Attorney General*, for the plaintiffs in error, in reply, stated the question to be, whether a State law, which rendered it criminal to import and sell foreign goods, without the permission of the State, which permission was only to be obtained by paying a tax to the State, was repugnant to the constitution, laws, and treaties of the Union. If the State of Maryland had the power to lay such a restraint on the importation and sale of foreign goods, every other State must have the same power; and the consequence would be, that this power of taxation would directly interfere, both with the power of regulating commerce, and with the taxing power of Congress. The quantum of tax imposed by the State could make no difference. The same principle would apply, as in the attempt of the same State to tax the Bank of the United States, where the Court held, that a power to tax, was a power to tax limited only by the pleasure of the State; and that it was, therefore, a power to destroy.[a]

In the present case, the power was denied upon two grounds; first, because the power exerted by the law in question is that of regulating commerce with foreign nations, and among the several States, which the Court has determined to be exclusively vested in Congress.[b] Secondly, because it was that of laying an impost, or duty on imports, without the consent of Congress.

In order to determine whether the present law interfered with the exercise of the power of regulating commerce, it was only necessary to see whether it undertook to prescribe the terms on which commerce may be carried on with fr-

a M'Culloch v. Maryland, 4 *Wheat. Rep.* 316.
b Gibbons v. Ogden, 9 *Wheat. Rep.* 1.

reign nations, and among the States. If it were a power to prescribe those terms, it was a power to prescribe the whole terms. After Congress, in the exercise of its exclusive power, has prescribed certain terms, it is incompetent for the States to add other terms. Could there be any doubt that the exclusive power of regulating foreign commerce included that of prescribing to all the citizens of the Union the conditions, and the whole conditions, on which they shall be permitted to bring into the United States, for sale or consumption, the productions of foreign countries? This power does not stop with the permission to bring them in : for if the States may prohibit their sale, or restrain, or burthen it, in any mode, they may, in effect, prohibit their importation. If they may prevent their sale, they may prohibit their barter or exchange, or use and consumption in the country, in any and every mode ; and thus effectually defeat the beneficial exercise of the permission to import. The States might even confiscate the goods, or order them to be burnt and destroyed after they were landed ; and this would no more interfere with the right of importation, according to the opposite argument, than the law now in question. And, it was asked, whether the sagacious statesmen who framed the constitution meant to confer upon Congress a power so idle and illusory? They looked to the exercise of this power of regulating commerce as a great source of national wealth and aggrandizement.[a] They looked to it as a great means of developing the agricultural and manufacturing resources of the country, and its general industry ; as an instrument by which the nation should be enriched at home, and rendered capable of countervailing the commercial regulations of foreign and rival nations. But if the power of regulating commerce ceases on the landing of the goods, and the whole subject is then delivered over to the discretion of the respective States, with their various partial and discordant views of policy, its exclusive exercise by Congress will be utterly vain and useless. So that the very existence of that commerce, a power of regulating and preserving which is so studiously conferred on Con-

a  The *Federalist*. No. 11.

gress, is at last made to depend upon the caprice and plea- 1827.
sure of the States. What signifies the power of regulation,
if the States may destroy the very substance of the thing Brown
to be regulated? Uniformity, or permanency of regulation, v.<br>State of<br>Maryland.
with a view to any purpose of policy, in regard to the agri-
cultural, manufacturing, or commercial interests of the na-
tion, is, of course, as much out of the question, as if there
were no Union, or as if it were still infected with all the
debility of the former confederation. The same State
power, exercised upon short sighted and narrow views,
might be exerted so as to defeat the other branch of the
power, that of regulating commerce among the States. The
free intercommunication which now prevails between the
States, may be effectually checked, by requiring a similar
license to import into a particular State the productions of
other States. So, also, what the State may do as to *imports*,
it may do as to *exports*. It may require a license from the
exporting merchant, and thus, in effect, lay a duty on ex-
ports, although both the States and Congress are expressly
forbidden in the constitution from laying such a duty ; and
the whole power of regulating the commerce, both of ex-
ports and imports, is exclusively vested in Congress. By
the joint exercise of these two usurped powers, the State
may establish a total non-intercourse with other States, and
with foreign nations, in direct violation of the laws, and
treaties, and constitution of the Union. Or it may make a
discrimination among foreign nations, or among the different
States, with a view of discouraging their commerce, or of
encouraging some branch of its own internal industry, in
direct repugnancy to the policy of the Union, as exhibited
in its laws and treaties. One of the avowed objects for con-
ferring the power of regulating commerce upon Congress,
was that of raising a revenue for the support of the national
government. It was foreseen, that the prosperity of com-
merce would best be promoted by uniform regulations con-
tained in the laws and treaties of the Union ; and it was
also foreseen, that an impost was that species of taxation
best suited to the genius and habits of the American people.

2 The *Federalist*, No 12.

But if the power now in question may be exercised by one State, it may be exercised by all; and the principal source from which the revenues of the Union were to be derived, will be dried up, or diverted to local purposes. In short, it was insisted, that all the evils for which the constitution was intended to provide an effectual remedy, would be entailed upon the country, by confirming the validity of such State laws as the act now in question.

*March 12th.*    Mr. Chief Justice MARSHALL delivered the opinion of the Court.

This is a writ of error to a judgment rendered in the Court of Appeals of Maryland, affirming a judgment of the City Court of Baltimore, on an indictment found in that Court against the plaintiffs in error, for violating an act of the legislature of Maryland. The indictment was founded on the second section of that act, which is in these words: " And be it enacted, that all importers of foreign articles or commodities, of dry goods, wares, or merchandise, by bale or package, or of wine, rum, brandy, whiskey and other distilled spiritous liquors, &c. and other persons selling the same by wholesale, bale or package, hogshead, barrel, or tierce, shall, before they are authorized to sell, take out a license, as by the original act is directed, for which they shall pay fifty dollars; and in case of neglect or refusal to take out such license, shall be subject to the same penalties and forfeitures as are prescribed by the original act to which this is a supplement." The indictment charges the plaintiffs in error with having imported and sold one package of foreign dry goods without having license to do so. A judgment was rendered against them on demurrer for the penalty which the act prescribes for the offence; and that judgment is now before this Court.

The cause depends entirely on the question, whether the legislature of a State can constitutionally require the importer of foreign articles to take out a license from the State, before he shall be permitted to sell a bale or package so imported.

It has been truly said, that the presumption is in favour of every legislative act, and that the whole burthen of proof lies on him who denies its constitutionality. The plaintiffs

in error take the burthen upon themselves, and insist that the act under consideration is repugnant to two provisions in the constitution of the United States.

1. To that which declares that " no State shall, without the consent of Congress, lay any imposts, or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws."

2. To that which declares that Congress shall have power " to regulate commerce with foreign nations, and among the several States, and with the Indian tribes."

1. The first inquiry is into the extent of the prohibition upon States " to lay any imposts or duties on imports or exports." The counsel for the State of Maryland would confine this prohibition to laws imposing duties on the act of importation or exportation. The counsel for the plaintiffs in error give them a much wider scope.

In performing the delicate and important duty of construing clauses in the constitution of our country, which involve conflicting powers of the government of the Union, and of the respective States, it is proper to take a view of the literal meaning of the words to be expounded, of their connexion with other words, and of the general objects to be accomplished by the prohibitory clause, or by the grant of power.

What, then, is the meaning of the words, " imposts, or duties on imports or exports ?"

An impost, or duty on imports, is a custom or a tax levied on articles brought into a country, and is most usually secured before the importer is allowed to exercise his rights of ownership over them, because evasions of the law can be prevented more certainly by executing it while the articles are in its custody. It would not, however, be less an impost or duty on the articles, if it were to be levied on them after they were landed. The policy and consequent practice of levying or securing the duty before, or on entering the port, does not limit the power to that state of things, nor, consequently, the prohibition, unless the true meaning of the clause so confines it. What, then, are " imports ?" The lexicons inform us, they are " things imported." If we appeal to usage for the meaning of the word, we shall receive the same answer. They are the articles themselves which are brought into the country " A duty on imports," then, is not merely

1827.

Brown
v.
State of
Maryland.

a duty on the act of importation, but is a duty on the thing imported. It is not, taken in its literal sense, confined to a duty levied while the article is entering the country, but extends to a duty levied after it has entered the country. The succeeding words of the sentence which limit the prohibition, show the extent in which it was understood. The limitation is, " except what may be absolutely necessary for executing its inspection laws." Now, the inspection laws, so far as they act upon articles for exportation, are generally executed on land, before the article is put on board the vessel; so far as they act upon importations, they are generally executed upon articles which are landed. The tax or duty of inspection, then, is a tax which is frequently, if not always paid for service performed on land, while the article is in the bosom of the country. Yet this tax is an exception to the prohibition on the States to lay duties on imports or exports. The exception was made because the tax would otherwise have been within the prohibition.

If it be a rule of interpretation to which all assent, that the exception of a particular thing from general words, proves that, in the opinion of the lawgiver, the thing excepted would be within the general clause had the exception r <sup>+</sup> been made, we know no reason why this general rule should not be as applicable to the constitution as to other instruments. If it be applicable, then this exception in favour of duties for the support of inspection laws, goes far in proving that the framers of the constitution classed taxes of a similar character with those imposed for the purposes of inspection, with duties on imports and exports, and supposed them to be prohibited.

If we quit this narrow view of the subject, and passing from the literal interpretation of the words, look to the objects of the prohibition, we find no reason for withdrawing the act under consideration from its operation.

From the vast inequality between the different States of the confederacy, as to commercial advantages, few subjects were viewed with deeper interest, or excited more irritation, than the manner in which the several States exercised, or seemed disposed to exercise, the power of laying duties on imports. From motives which were deemed sufficient by

the statesmen of that day, the general power of taxation, indispensably necessary as it was, and jealous as the States were of any encroachment on it, was so far abridged as to forbid them to touch imports or exports, with the single exception which has been noticed. Why are they restrained from imposing these duties? Plainly, because, in the general opinion, the interest of all would be best promoted by placing that whole subject under the control of Congress. Whether the prohibition to " lay imposts, or duties on imports or exports," proceeded from an apprehension that the power might be so exercised as to disturb that equality among the States which was generally advantageous, or that harmony between them which it was desirable to preserve, or to maintain unimpaired our commercial connexions with foreign nations, or to confer this source of revenue on the government of the Union, or whatever other motive might have induced the prohibition, it is plain, that the object would be as completely defeated by a power to tax the article in the hands of the importer the instant it was landed, as by a power to tax it while entering the port. There is no difference, in effect, between a power to prohibit the sale of an article, and a power to prohibit its introduction into the country. The one would be a necessary consequence of the other. No goods would be imported if none could be sold. No object of any description can be accomplished by laying a duty on importation, which may not be accomplished with equal certainty by laying a duty on the thing imported in the hands of the importer. It is obvious, that the same power which imposes a light duty, can impose a very heavy one, one which amounts to a prohibition. Questions of power do not depend on the degree to which it may be exercised. If it may be exercised at all, it must be exercised at the will of those in whose hands it is placed. If the tax may be levied in this form by a State, it may be levied to an extent which will defeat the revenue by impost, so far as it is drawn from importations into the particular State. We are told, that such wild and irrational abuse of power is not to be apprehended, and is not to be taken into view when discussing its existence. All power may be abused; and if the fear of its abuse is to constitute an argument against its

1827.

Brown
v.
State of
Maryland.

existence, it might be urged against the existence of that which is universally acknowledged, and which is indispensable to the general safety. The States will never be so mad as to destroy their own commerce, or even to lessen it.

We do not dissent from these general propositions. We do not suppose any State would act so unwisely. But we do not place the question on that ground.

These arguments apply with precisely the same force against the whole prohibition. It might, with the same reason be said, that no State would be so blind to its own interests as to lay duties on importation which would either prohibit or diminish its trade. Yet the framers of our constitution have thought this a power which no State ought to exercise. Conceding, to the full extent which is required, that every State would, in its legislation on this subject, provide judiciously for its own interests, it cannot be conceded, that each would respect the interests of others. A duty on imports is a tax on the article which is paid by the consumer. The great importing States would thus levy a tax on the non-importing States, which would not be less a tax because their interest would afford ample security against its ever being so heavy as to expel commerce from their ports. This would necessarily produce countervailing measures on the part of those States whose situation was less favourable to importation. For this, among other reasons, the whole power of laying duties on imports was, with a single and slight exception, taken from the States. When we are inquiring whether a particular act is within this prohibition, the question is not, whether the State may so legislate as to hurt itself, but whether the act is within the words and mischief of the prohibitory clause. It has already been shown, that a tax on the article in the hands of the importer, is within its words; and we think it too clear for controversy, that the same tax is within its mischief. We think it unquestionable, that such a tax has precisely the same tendency to enhance the price of the article, as if imposed upon it while entering the port.

The counsel for the State of Maryland insist, with great reason, that if the words of the prohibition be taken in their utmost latitude they will abridge the power of taxation.

which all admit to be essential to the States, to an extent which has never yet been suspected, and will deprive them of resources which are necessary to supply revenue, and which they have heretofore been admitted to possess. These words must, therefore, be construed with some limitation; and, if this be admitted, they insist, that entering the country is the point of time when the prohibition ceases, and the power of the State to tax commences.

It may be conceded, that the words of the prohibition ought not to be pressed to their utmost extent; that in our complex system, the object of the powers conferred on the government of the Union, and the nature of the often conflicting powers which remain in the States, must always be taken into view, and may aid in expounding the words of any particular clause. But, while we admit that sound principles of construction ought to restrain all Courts from carrying the words of the prohibition beyond the object the constitution is intended to secure; that there must be a point of time when the prohibition ceases, and the power of the State to tax commences; we cannot admit that this point of time is the instant that the articles enter the country. It is, we think, obvious, that this construction would defeat the prohibition.

The constitutional prohibition on the States to lay a duty on imports, a prohibition which a vast majority of them must feel an interest in preserving, may certainly come in conflict with their acknowledged power to tax persons and property within their territory. The power, and the restriction on it, though quite distinguishable when they do not approach each other, may yet, like the intervening colours between white and black, approach so nearly as to perplex the understanding, as colours perplex the vision in marking the distinction between them. Yet the distinction exists, and must be marked as the cases arise. Till they do arise, it might be premature to state any rule as being universal in its application. It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has,

1827.

Brown
v.
State of
Maryland.

perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the State ; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the constitution.

The counsel for the plaintiffs in error contend, that the importer purchases by payment of the duty to the United States, a right to dispose of his merchandise, as well as to bring it into the country ; and certainly the argument is supported by strong reason, as well as by the practice of nations, including our own. The object of importation is sale ; it constitutes the motive for paying the duties ; and if the United States possess the power of conferring the right to sell, as the consideration for which the duty is paid, every principle of fair dealing requires that they should be understood to confer it. The practice of the most commercial nations conforms to this idea. Duties, according to that practice, are charged on those articles only which are intended for sale or consumption in the country. Thus, sea stores, goods imported and re-exported in the same vessel, goods landed and carried over land for the purpose of being re-exported from some other port, goods forced in by stress of weather, and landed, but not for sale, are exempted from the payment of duties. The whole course of legislation on the subject shows, that, in the opinion of the legislature, the right to sell is connected with the payment of duties.

The counsel for the defendant in error have endeavoured to illustrate their proposition, that the constitutional prohibition ceases the instant the goods enter the country, by an array of the consequences which they suppose must follow the denial of it. If the importer acquires the right to sell by the payment of duties, he may, they say, exert that right when, where, and as he pleases, and the State cannot regulate it. He may sell by retail, at auction, or as an itinerant pedlar. He may introduce articles, as gunpowder, which endanger a city, into the midst of its population ; he may introduce articles which endanger the public health, and the power of self-preservation is denied. An importer may

bring in goods, as plate, for his own use, and thus retain much valuable property exempt from taxation.

These objections to the principle, if well founded, would certainly be entitled to serious consideration. But, we think, they will be found, on examination, not to belong necessarily to the principle, and, consequently, not to prove, that it may not be resorted to with safety as a criterion by which to measure the extent of the prohibition.

This indictment is against the importer, for selling a package of dry goods in the form in which it was imported, without a license. This state of things is changed if he sells them, or otherwise mixes them with the general property of the State, by breaking up his packages, and travelling with them as an itinerant pedlar. In the first case, the tax intercepts the import, as an import, in its way to become incorporated with the general mass of property, and denies it the privilege of becoming so incorporated until it shall have contributed to the revenue of the State. It denies to the importer the right of using the privilege which he has purchased from the United States, until he shall have also purchased it from the State. In the last cases, the tax finds the article already incorporated with the mass of property by the act of the importer. He has used the privilege he had purchased, and has himself mixed them up with the common mass, and the law may treat them as it finds them. The same observations apply to plate, or other furniture used by the importer.

So, if he sells by auction. Auctioneers are persons licensed by the State, and if the importer chooses to employ them, he can as little object to paying for this service, as for any other for which he may apply to an officer of the State. The right of sale may very well be annexed to importation, without annexing to it, also, the privilege of using the officers licensed by the State to make sales in a peculiar way.

The power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains, and ought to remain, with the States. If the possessor stores it himself out of town, the removal cannot be a duty on imports, because it contributes nothing to the revenue. If he prefers placing it in a public magazine, it is because he stores

it there, in his own opinion, more advantageously than else-where. We are not sure that this may not be classed among inspection laws. The removal or destruction of infectious or unsound articles is, undoubtedly, an exercise of that power, and forms an express exception to the prohibition we are considering. Indeed, the laws of the United States expressly sanction the health laws of a State.

The principle, then, for which the plaintiffs in error contend, that the importer acquires a right, not only to bring the articles into the country, but to mix them with the common mass of property, does not interfere with the necessary power of taxation which is acknowledged to reside in the States, to that dangerous extent which the counsel for the defendants in error seem to apprehend. It carries the prohibition in the constitution no farther than to prevent the States from doing that which it was the great object of the constitution to prevent.

But if it should be proved, that a duty on the article itself would be repugnant to the constitution, it is still argued, that this is not a tax upon the article, but on the person. The State, it is said, may tax occupations, and this is nothing more.

It is impossible to conceal from ourselves, that this is varying the form, without varying the substance. It is treating a prohibition which is general, as if it were confined to a particular mode of doing the forbidden thing. All must perceive, that a tax on the sale of an article, imported only for sale, is a tax on the article itself. It is true, the State may tax occupations generally, but this tax must be paid by those who employ the individual, or is a tax on his business. The lawyer, the physician, or the mechanic, must either charge more on the article in which he deals, or the thing itself is taxed through his person. This the State has a right to do, because no constitutional prohibition extends to it. So, a tax on the occupation of an importer is, in like manner, a tax on importation. It must add to the price of the article, and be paid by the consumer, or by the importer himself, in like manner as a direct duty on the article itself would be made. This the State has not a right to do, because it is prohibited by the constitution.

In support of the argument, that the prohibition ceases the instant the goods are brought into the country, a comparison has been drawn between the opposite words export and import. As, to export, it is said, means only to carry goods out of the country; so, to import, means only to bring them into it. But, suppose we extend this comparison to the two prohibitions. The States are forbidden to lay a duty on exports, and the United States are forbidden to lay a tax or duty on articles exported from any State There is some diversity in language, but none is perceivable in the act which is prohibited. The United States have the same right to tax occupations which is possessed by the States. Now, suppose the United States should require every exporter to take out a license, for which he should pay such tax as Congress might think proper to impose; would government be permitted to shield itself from the just censure to which this attempt to evade the prohibitions of the constitution would expose it, by saying, that this was a tax on the person, not on the article, and that the legislature had a right to tax occupations? Or, suppose revenue cutters were to be stationed off the coast for the purpose of levying a duty on all merchandise found in vessels which were leaving the United States for foreign countries; would it be received as an excuse for this outrage, were the government to say that exportation meant no more than carrying goods out of the country, and as the prohibition to lay a tax on imports, or things imported, ceased the instant they were brought into the country, so the prohibition to tax articles exported ceased when they were carried out of the country?

We think, then, that the act under which the plaintiffs in error were indicted, is repugnant to that article of the constitution which declares, that " no State shall lay any impost or duties on imports or exports."

2. Is it also repugnant to that clause in the constitution which empowers " Congress to regulate commerce with foreign nations, and among the several States, and with the Indian tribes?"

The oppressed and degraded state of commerce previous to the adoption of the constitution can scarcely be forgotten. It was regulated by foreign nations with a single view to

their own interests; and our disunited efforts to counteract their restrictions were rendered impotent by want of combination. Congress, indeed, possessed the power of making treaties; but the inability of the federal government to enforce them had become so apparent as to render that power in a great degree useless. Those who felt the injury arising from this state of things, and those who were capable of estimating the influence of commerce on the prosperity of nations, perceived the necessity of giving the control over this important subject to a single government. It may be doubted whether any of the evils proceeding from the feebleness of the federal government, contributed more to that great revolution which introduced the present system, than the deep and general conviction, that commerce ought to be regulated by Congress. It is not, therefore, matter of surprise, that the grant should be as extensive as the mischief, and should comprehend all foreign commerce, and all commerce among the States. To construe the power so as to impair its efficacy, would tend to defeat an object, in the attainment of which the American public took, and justly took, that strong interest which arose from a full conviction of its necessity.

What, then, is the just extent of a power to regulate commerce with foreign nations, and among the several States?

This question was considered in the case of *Gibbons* v. *Ogden*, (9 *Wheat. Rep.* 1.) in which it was declared to be complete in itself, and to acknowledge no limitations other than are prescribed by the constitution. The power is coextensive with the subject on which it acts, and cannot be stopped at the external boundary of a State, but must enter its interior.

We deem it unnecessary now to reason in support of these propositions. Their truth is proved by facts continually before our eyes, and was, we think, demonstrated, if they could require demonstration, in the case already mentioned.

If this power reaches the interior of a State, and may be there exercised, it must be capable of authorizing the sale of those articles which it introduces. Commerce is inter course: one of its most ordinary ingredients is traffic. It is inconceivable, that the power to authorize this traffic,

when given in the most comprehensive terms, with the intent that its efficacy should be complete, should cease at the point when its continuance is indispensable to its value. To what purpose should the power to allow importation be given, unaccompanied with the power to authorize a sale of the thing imported? Sale is the object of importation, and is an essential ingredient of that intercourse, of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right, not only to authorize importation, but to authorize the importer to sell.

If this be admitted, and we think it cannot be denied, what can be the meaning of an act of Congress which authorizes importation, and offers the privilege for sale at a fixed price to every person who chooses to become a purchaser? How is it to be construed, if an intent to deal honestly and fairly, an intent as wise as it is moral, is to enter into the construction? What can be the use of the contract, what does the importer purchase, if he does not purchase the privilege to sell?

What would be the language of a foreign government, which should be informed that its merchants, after importing according to law, were forbidden to sell the merchandise imported? What answer would the United States give to the complaints and just reproaches to which such an extraordinary circumstance would expose them? No apology could be received, or even offered. Such a state of things would break up commerce. It will not meet this argument, to say, that this state of things will never be produced; that the good sense of the States is a sufficient security against it The constitution has not confided this subject to that good sense. It is placed elsewhere. The question is, where does the power reside? not, how far will it be probably abused? The power claimed by the State is, in its nature, in conflict with that given to Congress; and the greater or less extent in which it may be exercised does not enter into the inquiry concerning its existence.

We think, then, that if the power to authorize a sale exists in Congress, the conclusion that the right to sell is connected with the law permitting importation, as an inseparable incident, is inevitable.

If the principles we have stated be correct, the result to which they conduct us cannot be mistaken. Any penalty inflicted on the importer for selling the article in his character of importer, must be in opposition to the act of Congress which authorizes importation. Any charge on the introduction and incorporation of the articles into and with the mass of property in the country, must be hostile to the power given to Congress to regulate commerce, since an essential part of that regulation, and principal object of it, is to prescribe the regular means for accomplishing that introduction and incorporation.

The distinction between a tax on the thing imported, and on the person of the importer, can have no influence on this part of the subject. It is too obvious for controversy, that they interfere equally with the power to regulate commerce.

It has been contended, that this construction of the power to regulate commerce, as was contended in construing the prohibition to lay duties on imports, would abridge the acknowledged power of a State to tax its own citizens, or their property within its territory.

We admit this power to be sacred; but cannot admit that it may be used so as to obstruct the free course of a power given to Congress. We cannot admit, that it may be used so as to obstruct or defeat the power to regulate commerce. It has been observed, that the powers remaining with the States may be so exercised as to come in conflict with those vested in Congress. When this happens, that which is not supreme must yield to that which is supreme. This great and universal truth is inseparable from the nature of things, and the constitution has applied it to the often interfering powers of the general and State governments, as a vital principle of perpetual operation. It results, necessarily, from this principle, that the taxing power of the States must have some limits. It cannot reach and restrain the action of the national government within its proper sphere. It cannot reach the administration of

justice in the Courts of the Union, or the collection of the taxes of the United States, or restrain the operation of any law which Congress may constitutionally pass. It cannot interfere with any regulation of commerce. If the States may tax all persons and property found on their territory, what shall restrain them from taxing goods in their transit through the State from one port to another, for the purpose of re-exportation? The laws of trade authorize this operation, and general convenience requires it. Or what should restrain a State from taxing any article passing through it from one State to another, for the purpose of traffic? or from taxing the transportation of articles passing from the State itself to another State, for commercial purposes? These cases are all within the sovereign power of taxation, but would obviously derange the measures of Congress to regulate commerce, and affect materially the purpose for which that power was given. We deem it unnecessary to press this argument farther, or to give additional illustrations of it, because the subject was taken up, and considered with great attention, in *M'Culloch* v. *The State of Maryland*, (4 *Wheat. Rep.* 316.) the decision in which case is, we think, entirely applicable to this.

It may be proper to add, that we suppose the principles laid down in this case, to apply equally to importations from a sister State. We do not mean to give any opinion on a tax discriminating between foreign and domestic articles.

We think there is error in the judgment of the Court of Appeals of the State of Maryland, in affirming the judgment of the Baltimore City Court, because the act of the legislature of Maryland, imposing the penalty for which the said judgment is rendered, is repugnant to the constitution of the United States, and, consequently, void. The judgment is to be reversed, and the cause remanded to that Court, with instructions to enter judgment in favour of the appellants.

Mr. Justice THOMPSON dissented. It is with some reluctance, and very considerable diffidence, that I have brought myself publicly to dissent from the opinion of the Court in this case; and did it not involve an important con-

Brown
v.
State of
Maryland.

stitutional question relating to the relative powers of the general and State governments, I should silently acquiesce in the judgment of the Court, although my own opinion might not accord with theirs.

The case comes before this Court on a writ of error to the Court of Appeals of the State of Maryland, upon a judgment rendered in that Court against the defendants. The proceedings in the Court below were upon an indictment against the defendants, merchants in the city of Baltimore, trading under the firm of Alexander Brown & Sons, and to recover against them the penalty alleged to have been incurred, for a violation of an act of the legislature of that State, by selling a package of foreign dry goods without having a license for that purpose, as required by said act: and the only question which has been made and argued is, whether the act referred to is in violation of the constitution of the United States.

The act in question was passed on the 23d of February, 1822, and is entitled " A supplement to the act laying duties on licenses to retailers of dry goods, and for other purposes." By the second section, under which the penalty has been recovered, it is enacted, " that all importers of foreign articles or commodities, of dry goods, wares, or merchandise, by bale or package, or of wine, rum, brandy, whiskey, and other distilled spiritous liquors, &c. and *other persons* selling the same by wholesale, bale, or package, hogshead, barrel, or tierce, shall, before they are *authorized to sell*, take out a license as by the original act is directed, for which they shall pay fifty dollars ; and, in case of neglect or refusal to take out such license, shall be subject to the same penalties and forfeitures as are prescribed by the original act to which this is a supplement."

By the original act, passed in 1819, *retail dealers* in foreign merchandise are required to take out a license ; and the supplemental act requires, that wholesale dealers should likewise take out a license to sell. These acts being *in pari materia*, are to be taken together, and their effect and operation manifestly is nothing more than to require retail and wholesale dealers in foreign merchandise, to take out a license before they should be authorized to sell such merchandise.

The act does not require a license to *import*, or demand any thing more of the importer than is required of any other dealer in the article imported. The license is for selling, and is general, applying to all persons : that all importers, and other persons selling by wholesale, bale, or package, &c. shall, before they are authorized to *sell*, take out a license, &c.

I understand it to be admitted, that these laws, so far as they relate to retail dealers, are not in violation of the constitution of the United States : and, if so, the question resolves itself into the inquiry, whether a distinction in this respect between a retail and wholesale dealer in foreign merchandise, can exist under any sound construction of the constitution.

The parts of the constitution which have been drawn in question on the discussion at the bar, and with which the law in question is supposed to be in conflict, are, that which gives to Congress the power to regulate commerce with foreign nations, and among the several States, and that which declares that no State shall, without the consent of Congress, lay any imposts, or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws.

It is very obvious, that this law can, in no manner whatever, affect the commercial intercourse between the States; it applies purely to the internal trade of the State of Maryland. The defendants were merchants, trading in the city of Baltimore. The indictment describes them as such, and alleges the sale to have been in that place ; and nothing appears to warrant an inference, that the package of goods sold was not intended for consumption at that place ; and the law has no relation whatever to goods intended for transportation to another State. It is proper here to notice, that although the indictment alleges, that the defendants did *import* and *sell*, yet the District Attorney, in framing the indictment, very properly considered the offence to consist in the selling, and not in the importation without a license. No one will pretend, that if the indictment had only alleged, that the defendants did import a package of foreign dry goods without a license, it could have been sustained. The

act applies to the importer, and *other persons* selling by wholesale; and the allegation that the defendants did import, is merely descriptive of the double character in which they were dealing, both as importers and sellers. The indictment would, undoubtedly, have been good, had it merely alleged that the defendants sold the package without a license. So that neither the act, nor the form in which the complaint is presented, makes any discrimination between the importer and any other wholesale dealer in foreign merchandise, but requires both to take out a license to sell; nor does it appear to me, that this law, in any manner, infringes or conflicts with the power of Congress to regulate commerce with foreign nations. It is to be borne in mind, that this was a power possessed by the States respectively before the adoption of the constitution, and is not a power growing out of the establishment of the general government. It is to be viewed, therefore, as the surrender of a power antecedently possessed by the States, and the extent of the surrender must receive a fair and reasonable interpretation with reference to the object for which the surrender was made. This was principally with a view to the revenue, and extended only to the external commerce of the United States, and did not embrace any portion of the internal trade or commerce of the several States. This is not only the plain and obvious interpretation of the terms used in the constitution, *commerce with foreign nations;* but such has been the construction adopted by this Court. In the case of *Gibbons* v. *Ogden*, (9 *Wheat. Rep.* 194.) the Court, in speaking of the grant of the power of Congress to regulate commerce, say, " It is not intended to comprehend that commerce which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to, or affect other States ; such a power would be inconvenient, and is certainly unnecessary. The enumeration of the particular classes of commerce to which the power was to be extended, would not have been made had the intention been to extend the power to every description. The enumeration presupposes something not enumerated, and that something, if we regard the language on the subject of the sentence must be the exclusively internal

commerce of a State. The genius and character of the whole government seems to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally, but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere for the purpose of executing some of the general powers of the government. The completely internal commerce of a State, then, may be considered as reserved for the State itself." And, again, (208.) " the acknowledged power of a State to regulate its police, its domestic trade, and to govern its own citizens, may enable it to legislate on this subject (commerce) to a considerable extent."

If such be the division of power between the general and State governments in relation to commerce, where is the line to be drawn between internal and external commerce? It appears to me, that no other sound and practical rule can be adopted, than to consider the external commerce as ending with the *importation* of the foreign article; and the *importation is complete*, as soon as the goods are introduced into the country, according to the provisions of the revenue laws, with the intention of being sold here for consumption, or for the purpose of internal and domestic trade, and the duties paid or secured. And this is the light in which this question has been considered by this and other Courts of the United States, (5 *Cranch*, 368. 9 *Cranch*, 104. 1 *Mason*, 499.) This, it will be perceived, does not embrace foreign merchandise intended for exportation, and not for consumption; nor articles intended for commerce between the States; but such as are intended for domestic trade within the State: and it is to such articles only that the law of Maryland extends. I cannot, therefore, think, that this law at all interferes with the power of Congress to regulate commerce; nor does it, according to my understanding of the constitution, violate that provision, with declares that no State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws.

1827.

Brown
v.
State of
Maryland.

The compensation required by this law to be paid for a license to sell, cannot be considered an impost or duty, within the sense and meaning of these terms, as used in the constitution. They refer to the foreign duty, and not to any charge that may grow out of the internal police of the States. It may indirectly fall on the imported articles, and enhance the price in the sale; but even this is not an expense imposed on the importer or other seller, but is borne ultimately by the consumer.

But the broad principle has been assumed on the argument that the payment of the foreign duty is a purchase of the right and privilege, not only of introducing the goods into the country, but of selling them free from any increased burden imposed by the States; and, unless this principle can be sustained, the law in question is not in violation of the constitution.

The counsel, however, aware that the principle thus broadly laid down, if practically carried out to its full extent, would lead to consequences so obviously intenable, that it would at once show the unsoundness of the principle itself, have limited its application to the first wholesale disposition of the merchandise. Can such a distinction, however, be sustained? There is nothing certainly in the letter of the constitution to support it; nor does it fall within any reasonable intendment growing out of the nature of the subject matter of the provision. The prohibition to the States is against laying any impost or duty on *imports*. It is the merchandise that is exempted from the imposition. The constitution no where gives any extraordinary protection to the importer. So that, if the law was confined to the importer only, he could find no exemption from the operation of State laws. Nor is there, according to my judgment, any rational grounds, upon which the constitution may be considered as extending such exemption to wholesale, and not to retail dealers. If the payment of the foreign duty is the purchase of the privilege to sell, as well as to introduce the article into the country, where can be the difference whether this privilege is exercised in the one way or the other? The retail merchant often imports his own goods; and why should he be compelled to take out a license to sell.

when his neighbour, who imports and sells by wholesale, is exempted. But the distinction is altogether fruitless, and does not effect the object supposed to have been intended, viz. to take from the States the power of imposing burdens upon foreign merchandise, that might tend to lessen or entirely prevent the importation, and thereby diminish the revenue of the United States. It is very evident that no such purpose can be accomplished, by limiting the protection to the first sale. It was admitted, that after the first sale, and the article becomes mixed and incorporated in the general mass of the property of the country, and to be applied to domestic use, it loses this pretended privilege. But every one knows, that whatever charge or burden is imposed upon the retail sale, affects the wholesale indirectly, as much as if laid directly upon the wholesale. The retail dealer takes this charge into calculation in the purchase from the wholesale merchant, and which, of course, equally affects the importation. Suppose the fifty dollars required to be paid by the wholesale dealer, was imposed on the retail merchant, would it not equally affect the importation? It would equally increase the burden, and enhance the expense of the article when it comes into the hands of the consumer, and on whom all the charges ultimately fall. And if these charges are so increased by the State governments, in any stages of the internal trade, as to check their sale for consumption, it will necessarily affect the importation. So that nothing short of a total exemption from State charges or taxes, under all circumstances, will answer the supposed object of the constitution. And to push the principle to such lengths, would be a restriction upon State authority, not warranted by the constitution.

It certainly cannot be maintained, that the States have no authority to tax imported merchandise. But the same principle of discrimination between the wholesale and retail dealer, as to a license to sell, would seem to me, if well-founded, to extend to taxes of every description. And it would present a singular incongruity, to exempt a wholesale merchant from all taxes upon his stock of goods, and subject to taxation the like stock of his neighbour who was selling by retail

1827.

Brown
v.
State of
'aryland.

It is laid down in No. 32 of the *Federalist*, (and I believe universally admitted,) " that the States, with the sole exception of duties on imports and exports, retain authority to tax in the most absolute and unqualified sense ; and any attempt on the part of the national government to abridge them in the exercise of it, would be a violent assumption of power, unwarranted by any article or clause in the constitution." Although an impost or duty may be considered a tax in its most enlarged sense, yet every tax cannot be understood to mean an impost or duty in the sense of the constitution. As here used, it evidently refers to the foreign duty imposed by revenue laws. It would be a singular use of the term *impost*, to apply it to a tax on real estate ; and no one, I presume, would contend, that all imported articles upon which the duties have been paid, are exempt from all State taxation in the hands of the consumer. And yet this would follow, if *duty* and *tax* are, in all respects, synonymous ; for the constitution declares, that no State shall lay any *duty* on *imports*, viz. the article imported. To avoid these consequences, which are certainly inadmissible, the inhibition to the States must be understood as extending only to foreign duties, and not to taxes imposed by the States, after the imports become articles of internal trade, and for domestic use and consumption ; they then become subject to State jurisdiction.

This law seems to have been treated as if it imposed a tax or duty upon the importer, or the importation. It certainly admits of no such construction. It is a charge upon the wholesale dealer, whoever he may be, and to operate upon the sale, and not upon the importation. It requires the purchase of a privilege to sell, and must stand on the same footing as a purchase of a privilege to sell in any other manner, as by retail, at auction, or as hawkers and pedlars, or in whatever way State policy may require. Whether such regulations are wise and politic, is not a question for this Court. If the broad principle contended for on the part of the plaintiffs in error, that the payment of the foreign duty is a purchase of the privilege of selling, be well founded, no limit can be set by the States to the exercise of this privilege. The first sale may be made in defiance of all State

regulation; and all State laws regulating sales of foreign goods at auction, and imposing a duty thereupon, are unconstitutional, so far, at all events, as the sale may be by bale, package, hogshead, barrel or tierce, &c. And, indeed, if the right to sell follows as an incident to the importation, it will take away all State control over infectious and noxious goods, whilst unsold, in the hands of the importer. The principle, when carried out to its full extent, would inevitably lead to such consequences.

It has been urged with great earnestness upon the Court, that if the States are permitted to lay such charges and taxes upon imports, they may be so multiplied and increased as entirely to stop all importations. If this argument presents any serious objection to the law in question, the answer to it, in my judgment, has already been given: that the limitation, as contended for, of State power, will not effect the objects proposed. Whether this additional burden is imposed upon the wholesale or retail dealer, it will equally affect the importation; and nothing short of a total exemption from all taxation and charges of every description, will take from the States the power of legislating so as in some way may indirectly affect the importation.

But arguments drawn against the existence of a power from its supposed abuse are illogical, and generally lead to unsound conclusions. And this is emphatically so when applied to our system of government. It supposes the interest of the people, under the general and State governments, to be in hostility with each other, instead of considering the two governments as parts only of the same system, and forming but one government for the same people, having for its object the same common interest and welfare of all.

If the supposed abuse of a power is a satisfactory objection to its existence, it will equally apply to many of the powers of the general government; and it is as reasonable to suppose that the people would wish to injure or destroy themselves, through the instrumentality of the one government as the other.

The doctrine of the Court in the case of *M'Culloch* v. *the State of Maryland,* (4 *Wheat. Rep.* 316.) has been urged

as having a bearing upon this question unfavourable to the validity of the law. But it appears to me, that that case warrants no such conclusion. It is there admitted, that the power of taxation is an incident of sovereignty, and is co-extensive with that to which it is an incident. And that all subjects, over which the sovereign power of a State extends, are objects of taxation. The bank of the United States could not be taxed by the States, because it was an instrument employed by the government in the execution of its powers. It was called into existence under the authority of the United States, and of course could not have previously existed as an object of taxation by the States. Not so, however, with respect to imports; they were in existence, and under the absolute jurisdiction and control of the States, before the adoption of the constitution. And it is, therefore, as to them, a question of surrender of power by the States, and to what extent this has been given up to the United States. And it is expressly admitted in that case, that the opinion did not deprive the States of any resources they originally possessed; nor to any tax paid by the real property of the bank, in common with the other real property within the State; nor to a tax imposed on the interest which the citizens of Maryland may hold in the institution, in common, with other property of the same description throughout the State. But the tax was held unconstitutional, because laid on the operations of the bank, and consequently a tax on the operation of an instrument employed by the government of the Union to carry its powers into execution; and this instrument, created by the government of the Union. But these objections do not apply to the law in question. The government of the Union found the States in the full exercise of sovereign power over imports. It was one of the sources of revenue originally possessed by the States. The law does not purport to act directly upon any thing which has been surrendered to the general government, viz. the external commerce of the State. It may operate indirectly upon it to some extent; but cannot be made essentially to impede or retard the operations of the government; not more so than might be effected by a tax on the stock held by individuals in the bank of the United States. And, indeed, the power

of crippling the operations of the government, in the former case, would not be so practicable as in the latter; for it has the whole range of the property of its citizens for taxation, and to provide the means for carrying on its measures. So that it would be beyond the reach of the States materially to affect the operations of the general government, by taxing foreign merchandise, should they be disposed so to do.

I am, accordingly, of opinion, that the judgment of the Court of Appeals of the State of Maryland ought to be affirmed.

JUDGMENT. This cause came on, &c. On consideration whereof, this Court is of opinion, that there is error in the judgment rendered by the said Court of Appeals in this, that the judgment of the City Court of Baltimore, condemning the said Alexander Brown, George Brown, John. A. Brown, and James Brown, to pay the penalty therein mentioned, ought not to have been so rendered against them, because the act of the legislature of the State of Maryland, entitled, " An act supplementary to the act laying duties on licenses to the retailers of dry goods, and for other purposes," on which the indictment on which the said judgment was rendered is founded, so far as it enacts, " that all importers of foreign articles, of dry goods, wares, or merchandise, by bale or package, or of wine, rum, brandy, whiskey, or other distilled spiritous liquors, &c. selling the same by wholesale, bale, or package, hogshead, barrel, or tierce, shall, before they are authorized to sell, take out a license as by the original act is directed, for which they shall pay fifty dollars; and, in case of neglect or refusal to take out such license, shall be subject to the same penalties and forfeitures as are prescribed by the original act to which this is a supplement," is repugnant to the constitution of the United States, and void; wherefore the said Court of Appeals, before whom the said judgment of the said City Court of Baltimore was brought by appeal, ought not to have affirmed, but should have reversed, the same. Wherefore it is CONSIDERED by this Court, that the said judgment of the said Court of Appeals, affirming the said judgment of the City Court of Bal-

1827.

U. States
v.
Gooding.

timore, be REVERSED and ANNULLED, and that the cause be remanded to the said Court of Appeals, with directions to reverse the same.