## PEOPLE v. MORING.

### March, 1867.

#### Affirming 47 *Barb.* 642.

The act (2 *L.* 1866, p. 1187, c. 547, amending *L.* 1846, c. 62),—by which a duty on brokers' sales of imported merchandise is imposed,—is not unconstitutional as in contravention of the provision of the constitution of this State, art. 7, § 13, requiring tax laws to distinctly state the tax and the object ; but it is in contravention of the provisions of the constitution of the United States, Art. 1, §§ 8–10, giving Congress exclusive power to lay duties on and regulate foreign commerce.

Henry E. Moring was indicted in the court of general sessions of the peace, in New York, for selling sixty thousand bags of Java coffee as a broker, without having given the bond

---

required by the acts of 1866 and 1846 above referred to, for the payment of duty on such sales.

The statute in question declares that "All goods, wares and merchandise, and every other species of personal property, which at any time shall be exposed to sale by public auction or offered for sale by sample or otherwise by brokers, . . . shall be subject, each and every time that they shall be sold, to fees or duties at the following rates," &c.

Other provisions direct the fees to be paid by the person making the sales, and forbid auctioneers and brokers engaged in selling such merchandise, to engage in such business until after having given a bond to the people of the State for the payment of the fees.

The defendant demurred to the indictment, and the court sustained the demurrer, whereupon error was brought by the People to the supreme court.

*The supreme court* held, that the act was not only a violation of the constitution of the United States, but also a violation of the provisions of the State constitution referred to in the opinion of HUNT, J. They accordingly affirmed the judgment.

The People brought error to this court.

*George Bliss, Jr.*, for plaintiffs;—Cited *L.* 1784 (1 *Greenl.* 64), 1791 and 1792 (2 *Greenl.* 313, 470); *L.* 1806, c. 81; 1817, c. 285; *Const.* 1821; § 10, art. 7; *L.* 1824, c. 47; 1828, 1835. c. 62; *Const.* 5 Amend. 1835, c. 147; *L.* 1838, c. 52; 1846, c. 62; 1866; *Const. U. S.* art. I. § 8, subd. 3; art. I. § 10, subd. 2; Brown *v.* State of Maryland, 12 *Wheat.* 419, 441; License Case, 5 *How. Pr.* 504, 574, 585, 590, 610; People *v.* Huntington, 4 *N. Y. Leg. Obs.* 187; Gibbons *v.* Ogden, 9 *Wheat.* 195; 5 *How. Pr.* 622; Commonwealth *v.* Kimball, 24 *Pick.* 359, 360, 362; Smith *v.* People, 1 *Park. Cr.* 583; Pierce *v.* State, 13 *N. H.* 586; Nathan *v.* Louisiana, 8 *How. Pr.* 78, 80; Cummings *v.* Mayor, *R. M. Charlton*, 26; People *v.* Coleman, 4 *Cal.* 46, 56; People *v.* Supervisors of Orange, 17 *N. Y.* 235.

*Wm. M. Evarts* and *Waldo Hutchins*, for defendant;—Cited *Const.* § 13, art. 7; People *v.* Mayor of Brooklyn, 4 *N. Y.* (4

*Comst.*) 424; Town of Guilford *v.* Supervisors, 13 *N. Y.* (3 *Kern.*) 143; Mayor of N. Y. *v.* Second Ave. R. R. Co., 32 *Id.* 261; 11 *Johns.* 80; 2 *Coke Ins.* 532; Almy *v.* California, 24 *How. U. S.* 169; Brown *v.* Maryland, 12 *Wheat.* 419, 440, 447.

HUNT, J. [After stating the facts.]—The demurrer was sustained in the court below upon the ground that the act of the legislature of New York in question was repugnant to the Constitution of the United States, and void. It was also held to be in violation of the provisions of section 13 of article 7 of the Constitution of the State of New York, and to be void for that reason. I shall examine these questions only, disregarding some defects and omissions in the framework of the indictment, which, if insisted upon, might be the occasion of technical embarrassment.

The defendant claims the law in question to be invalid, as being repugnant to that provision of the constitution of the United States which authorizes Congress "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes," and also with that provision of the same instrument which declares that "No State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws" (art. 1, § 8, subd. 3; § 10, subd. 2).

The exaction from the broker of the fees or duties required by the law of 1866, now before us, is claimed by him to be an interference with commerce, and to be a tax or duty upon imports, and so in violation of the constitutional provisions quoted.

These provisions of the United States constitution have been the subject of frequent consideration in the federal courts; and in seeking a conclusion in the present case, we are not without the aid of great landmarks to guide us in our way. An examination of the principles of the adjudicated cases will assist us in reaching a correct result in the case before us.

The case of Gibbons *v.* Ogden, 9 *Wheat.* 1, involved the validity of the act of the legislature of the State of New York granting to Livingston and Fulton the exclusive navigation of

all the waters within the jurisdiction of that State, with boats. moved by fire or steam, for a term of years. These acts were adjudged to be a violation of the constitutional provision authorizing Congress to regulate commerce among the States, so far as they prohibited vessels licensed according to the laws of the United States for carrying on the coasting trade, from navigating the said waters by means of fire or steam. In discusssing the question, what is this power of regulation, Chief Justice MARSHALL says: "It is the power to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the constitution. . . . The wisdom and discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this as in many other instances,—as that, for example, of declaring war,—the sole restraints on which they have relied to secure them from its abuse. They are the restraints on which the people must often rely solely in all representative governments."

This power to regulate commerce is exclusively in Congress, and cannot be exercised by the States (p. 199). Still, there remain to the States the rights, so important in their effects upon commerce, and so difficult to distinguish from its regulation, of framing and executing inspection laws, quarantine laws, health laws of every description, and a regulated system of pilotage.

In the case of Brown v. State of Maryland, 12 Wheat. 419, the leading opinion was delivered by the same learned judge; and the court held that an act of the legislature of the State of Maryland, requiring all importers of foreign goods by the bale or package, and other persons selling the same by wholesale, bale or package, to take out a license, for which they should pay fifty dollars, and in case of neglect, subjecting them to certain forfeitures and penalties, was repugnant to the section of the United States constitution already quoted, in reference to regulating commerce, as well as to that forbidding the laying of duties or imposts.

The reasoning of the court is briefly this: An impost or

duty on imports is a custom or tax levied on articles imported, or brought into a country. Usually, and to prevent evasions of the law, this right is exercised before the importer is permitted to take possession of the goods. It is none the less an impost, however, when the levy is delayed until the goods are landed. The power to tax immediately upon landing is the same as the power to tax while entering the port. There is no difference between the power to prohibit the sale of an article and a power to prevent its introduction into the country. No goods would be imported if none could be sold. The same power which imposes a light duty may impose one amounting to prohibition. When the importer has so acted on the thing imported that it has become incorporated and mixed up with the mass of property in the country, it loses its distinctive character as an import, and becomes subject to the taxing power of the State; but while remaining the property of the importer, in his warehouse, in the original form or package in which it is imported, a tax upon it is plainly a tax upon imports, within the prohibition of the constitution. A tax on the sale of an article imported only for sale is a tax on the article itself.

I shall have occasion again to allude to certain distinctions contained in this opinion, which will be pertinent to the case in hand.

The three cases against the States of Massachusetts, Rhode Island and New Hampshire, termed the *License Cases,* are reported in 5 *How. U. S.* 504. It was there held that a law of Massachusetts, providing that no person shall presume to be a retailer of wine, brandy, &c., in less quantity than twenty-eight gallons, and that delivered and carried away all at one time, unless he is first licensed as a retailer of wine and spirits, and that the commissioners shall not be required to grant such license when in their opinion the public good does not require it, was not inconsistent with any provision of the United States constitution, or any act of Congress under it.

The law of Rhode Island forbade the sale of rum, gin, brandy, &c., in a less quantity than ten gallons, although the brandy which was sold in this case was duly imported from France into the United States, and purchased, by the party in-

dicted, from the original importer. The law of New Hamp-shire imposed a similar restriction, although in this case the article sold was a barrel of American gin, purchased in Boston, carried coastwise to Piscataqua, and there sold in the same barrel. These laws were also held to be valid within the pro-visions of the constitution and laws of the United States.

In these cases the leading opinion was delivered by TANEY, Ch. J.

These decisions were placed upon the ground that, although the regulation of commerce with foreign nations and among the several States belonged exclusively to Congress, the regula-tion of the internal traffic of a State belonged to itself, free from any control or interference on the part of the Federal government.

The doctrine of Brown v. Maryland, that while goods were in the hands of the importer, in the shape in which they were introduced, and in which they were intended to be sold, they were not subject to taxation, either by direct assessment or by requiring a license to sell, was reiterated. The laws in ques-tion were held not to act upon the article until after it had passed the line of foreign commerce, and become a part of the general mass of the property of the State.

It was decided in Nathan v. Louisiana, 8 How. U. S. 73, that a tax imposed by a State upon all money or exchange brokers was not void for repugnance to constitutional power of Con-gress to regulate commerce; and this although the business of the defendant Nathan was confined exclusively to the sale and purchase of foreign bills of exchange.

It was held to be a tax upon the business of the defendant simply, upon his credit or his capital, and not a charge upon the commerce of the country.

The last case to which I shall refer is that of Almy v. State of California, 24 How. U. S. 169. The defendant Almy was in-dicted for a violation of a law of the State of California, which required a stamp of a certain value, expressing the amount of the duty, to be attached to any bill of lading for the trans-portation of gold or silver to any place without the State. The court held that this was substantially a tax on exports; that a bill of lading or some similar document, was an invariable ac-

companiment of shipment, and that a tax upon the instrument was a tax upon the article itself. They say: " The intention to tax the export of gold and silver, in the form of a tax on a bill of lading, is too plain to be mistaken."

The principles to be extracted from these cases are as follows:

1. That the power of regulating commerce with foreign nations, and among the States, and the power of taxing imports or exports, belongs to Congress exclusively.

2. That Congress has no power to interfere with the internal traffic of a State. That authority is vested in the State alone.

3. That imported property, while remaining in the hands of the importer in its original form, cannot be taxed by State authority.

4. That when it leaves the importer's hands, and becomes incorporated with the general mass of the property of the country, it becomes subject to State taxation.

5. That taxation upon the right to sell in any form an article of import, intended for sale, or upon the necessary instrument of exporting an article intended for export, is a taxation upon the article itself, and not permitted by the Federal constitution.

6. That the imposition by a State of a tax upon a particular kind of business is constitutional, although the subject matter of the business relate entirely to dealings with foreign countries.

Judged by these principles, I can discover no objection to the legislative acts now under discussion.

Since the year 1784, the legislature of the State of New York has, from time to time, passed laws taxing the sales of goods by auctioneers. This has been the practice, both as to foreign and domestic goods. *L.* 1784 (1 *Greenl.*) 64; *L.* 1792 (2 *Greenl.*) 470.

The constitution of 1821 recognized this practice, and provided for the purposes to which the moneys thus received should be applied. § 10, art. 7; *L.* 1824, c. 47; *L.* 1838, c. 52; *L.* 1864, c. 62.

This taxation has been a valuable source of revenue to the State of New York, often reaching to a quarter of a million of dollars annually. During a period of eighty years this

III—35

right has been unchallenged. The fact that no dispute has been raised upon this point for so long a period of time, is strong evidence that the right cannot be successfully disputed. See Ryan v. N. Y. C. R. R. Co., 35 N. Y. 210; Costigan v. M. & H. R. R. Co., 2 Den. 609.

The right to tax sales by auction is fully recognized in Brown v. Maryland, supra. The learned chief justice says: "So, if he sells by auction. Auctioneers are persons licensed by the State, and if the importer chooses to employ them, he can as little object to paying for this service as for any other for which he may apply to an officer of the State. The right of sale may very well be annexed to importation, without annexing to it also the privilege of using the officers licensed by the State, to make sales in a peculiar way." And again: "It is true, the State may tax occupations generally, but this tax must be paid by those who employ the individual, or is a tax on his business. The lawyer, the physician, or the mechanic, must either charge more on the article in which he deals, or the thing itself is taxed through his person. This the State has a right to do, because no constitutional prohibition extends to it." A tax on the occupation of an importer, he says, is prohibited by the constitution.

In Nathan v. Louisiana (supra), Justice McLean, in delivering the opinion of the court, uses this language: "Under the law, every person is free to buy or sell bills of exchange, as may be necessary in his business transactions; but he is required to pay the tax if he engages in the business of a money or an exchange broker. The right of a State to tax its own citizens for the prosecution of any particular business or profession within the State has not been doubted. And we find that in every State money or exchange brokers, vendors of merchandise of our own or foreign manufacture, retailers of ardent spirits, tavern-keepers, auctioneers, those who practice the learned professions, and every description of property not exempted by law, are taxed."

The right to tax the proceeds of auction sales, when the articles sold are imported from foreign countries, is not within any of the prohibited principles heretofore stated as drawn from the decisions of the federal courts. It may be enforced

without a violation of any of them. The importer may re-ship to foreign countries if he desires. He may consign his goods to the interior, if he finds it to his interest to do so. He may sell them at his own counter or warehouse for cash or credit. He may exercise every conceivable act of ownership, without restraint or liability to taxation, with a single excep-tion. If he resorts to the mode of a sale at public auction, the sale subjects the auctioneer to the payment of a duty upon the amount of his sales. It seems to me quite extravagant to maintain that this exception is an infringement upon the right to import, or that it imposes a tax upon the business of the importer.

I conclude that the long-existing laws of the State, imposing taxes upon sales by auctioneers, are valid. I am unable to perceive that sales made by brokers stand upon any different footing. Neither the auctioneer nor the broker, so far as the present case shows, is a public officer, required to take an oath of office, and indictable at common law for failure to perform his duties. Each is a *quasi* officer, required to give to the State a bond, with sureties, conditioned for the faithful per-formance of the duties of his office, and is by statute made liable to an indictment if he attempts to act without having given the required bond. The one invites competition for the articles intended to be sold, by *viva voce* bidding at an assem-blage of people. The other invites competition by calling individually for the bids of those who desire to purchase the articles to be sold, or by receiving their bids at his own place of business. Each is a middleman acting as agent, both for a buyer and a seller. The moment he ceases to represent each of these parties, he ceases to be an auctioneer or broker, and becomes a party on his own account, or an agent for a buyer only, or a seller only. Each receives his compensation from the parties for whom he acts, and each is bound to pay the duties to the State. I can see no substantial difference between the vocation of a broker and that of an auctioneer, for the purposes of the question before us. The duties im-posed upon the sales of the latter have long been recognized by the laws of this State, as well as by the statements of the Federal judges, as properly imposed. I believe this recognition

is due to the justice of the claim, and that the constitutional inhibitions which I have discussed could not at any time have been successfully urged against the collection of these duties. The tax upon brokers' sales occupies the same ground, and, in my opinion, is legally chargeable under the law in question. This demurrer, therefore, cannot be sustained on the ground that the law in question is repugnant to the provisions of the constitution of the United States.

It is said, again, that the act of the legislature of the State of New York of the year 1866 is invalid, as being in violation of section 13, article 7, of the constitution of this State. That section is as follows: "Every law which imposes, continues or revives a tax, shall distinctly state the tax, and the object to which it is to be applied; and it shall not be sufficient to refer to any other law to fix such tax or object."

It will be observed that the original act was passed in the year 1846, before the adoption of the constitution containing the present provision. No such provision was contained in the constitution of 1821. By article 7, section 10, of that instrument, all duties upon goods sold at auction were appropriated to the completion of the navigable waters of the State, and the payment of the debt contracted in the construction of the same. By the fifth amendment to the constitution of 1821, this appropriation of duties was determined, and the same were thereby restored to the "General Fund" of the State. There was thus a permanent and express appropriation of these duties when the act of 1846 was passed. The act of 1866, in question, merely made an addition to the subject matter of the former law. It provided that sales of brokers should be placed in the same category, in regard to the payment of duties, as sales by auctioneers. It was simply an amendment of an existing law, valid in all its provisions. It may be doubted whether such an amendment can properly be termed the imposition or revival of a tax.

Again: I agree with the intimation of Judge OAKLEY, in Sun Mut. Ins. Co. *v.* City of New York, 5 *Sandf.* 10, 14; that this section was not intended to be applied to laws which imposed duties, fees, or excises on particular professions, classes of trade, or individuals, but that the same relates only

to a general tax upon the property of the State. The section of the constitution immediately preceding forbids the creation of a State debt, except under certain restrictions, and provides that the law authorizing the debt shall also provide for the imposition of a direct annual tax, to pay the interest and the principal within a specified time. This law is required to remain in force until the debt is paid or provided for. This section, I have no doubt, contemplates a general tax upon all the property of the State, and was not intended to be satisfied with, or to apply to, a local tax upon a particular section, or to a tax imposing fees or duties upon trades or individuals, although the same are direct taxes, equally as if imposed upon the entire property of the State. The section in question is applicable to the same class of taxation, and was never intended to reach a case like the present. Hawkers' and peddlers' fees, canal tolls, railroad tolls, are all taxes, in the enlarged meaning of that term, but, I apprehend, not within the meaning of that expression in the section of the constitution under consideration.

Judgment should be reversed, and judgment ordered for the People upon the indictment, with leave to the defendant to withdraw his demurrer and plead to the indictment within twenty days.

All the judges, except BOCKES, J., not voting, concurred with HUNT, J., in the opinion that the act was not in conflict with the State constitution.

SCRUGHAM, J.—The questions presented by this appeal are as to the conformity of the act of April 13, 1866, entitled "An act to amend chapter sixty-two of the Laws of eighteen hundred and forty-six, and other acts additional to the same," with the constitutions of this State and of the United States.

The objection that it does not comply with the provisions of section 13, article 7, of the constitution of this State, is fully answered in the opinion of Judge HUNT, and it is only necessary to consider whether the act is in any respect repugnant to the constitution of the United States.

By section 8 of article 1 of the constitution of the United

States, it is, among other things, provided that Congress shall have power to lay and collect duties, imposts, and excises, and to regulate commerce with foreign nations; and section 10 of the same article provides, among other things, " that no State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for exercising its inspection laws; and the net produce of all duties and imposts laid by any State on imports or exports, shall be for the use of the treasury of the United States, and all, such laws shall be subject to the revision and control of the Congress."

The act under which the defendant in error was indicted, subjects " foreign wines and ardent spirits," and " all goods, wares, merchandise and effects imported from any place beyond the Cape of Good Hope," and " all other goods, wares, merchandise and effects which are the production of any foreign country," offered for sale by sample or otherwise by brokers, every time they shall be sold, to duties, which are specified in the act, and are payable into the treasury of the State for its use.

It thus, by its very terms, lays duties upon imported articles, and in no manner discriminates between such as retain, and such as have lost, their character as imports; and, as it affects sales of the former, it is to that extent in conflict with the provisions of the constitution of the United States.

There can be no doubt of the power of a State to tax articles which have been imported for sale, after they have passed into the mass of general property, by being sold by the importer either for consumption or resale, or by being divided by him into smaller quantities by the breaking up of the casks or packages in which they were imported, so as to destroy the character of import which subjected them to duties under the laws of the United States; but until the importer has so, by sale or otherwise, acted upon the articles as to cause them to lose their character of imports; a State tax upon them would be in direct violation of the constitutional prohibition; and a tax upon their sale, if it were possible to regard it otherwise than as a tax upon the article itself, would be in derogation of the right to sell, which is an inseparable incident of the law permitting

importation, and which the importer acquired by the payment of duties to the United States.

Such a power in a State is incompatible with the power of Congress to regulate commerce, for it could be used to destroy it, by subjecting sales of imported articles to so high a tax as absolutely to prevent them.

The case of Brown *v.* State of Maryland, 12 *Wheat.* 419, was one involving the constitutionality of an act of the legislature of Maryland, requiring importers and other persons selling certain imported foreign merchandise by wholesale, by the bale or package, to take out a license, and pay a fee of fifty dollars therefor.

The right of a State to impose duties upon imports and the sales of imported merchandise, was there fully considered, and is discussed with great ability in the opinion of the court, which embodies an unanswerable argument against State taxation of imported merchandise, or sales of such merchandise, until it has lost its character of an import.

It is said, in the course of the opinion, that "auctioneers are persons licensed by the State, and if the importer chooses to employ them, he can as little object to paying for this service as for any other for which he may apply to an officer of the State."

The right of sale may very well be annexed to importation, without annexing to it also the privilege of using the officers' licensed by the State to make a sale in a peculiar way.

It is not claimed that brokers are in any respect officers of the State of New York, and therefore this consideration as to sales by State officers, such as the auctioneers to whom allusion is made, is inapplicable to the question before us.

In Nathan *v.* Louisiana, 8 *How. U. S.* 73, it was held that a State tax upon brokers in bills of exchange, was not repugnant to the constitution of the United States, because it was a tax which the State had an undoubted right to impose on a citizen for the prosecution of a particular avocation within its jurisdiction; and because foreign bills of exchange are neither exports nor imports. Though such bills are instruments of commerce, they are no more so than products of agriculture or manufactures, over which the taxing power of the State extends, until they are separated from the general mass of property by becoming exports.

People *ex rel.* Latorre *v.* O'Brien.

. The distinction between that case and this is therefore very apparent, for the act then upheld did not subject exports or imports to State taxation, but only imposed a duty upon the prosecution of a particular business within the State, while the act now under consideration subjects imports to State taxation, and cannot be construed as merely imposing a tax upon brokers in respect to their avocation. The act assumes to impose duties on the imports sold, and not on the brokers by whom the sales are made.

The judgment should be affirmed.

DAVIES, Ch. J., and WRIGHT, GROVER, and PORTER, JJ., concurred in this opinion.

Judgment affirmed, with costs.