STATE OF IOWA and LEO J. WEGMAN, Treasurer, Appellees, v. STANDARD OIL COMPANY, Appellant.

No. 43113.

January 19, 1937.

Rehearing Denied June 18, 1937.

Parrish, Guthrie, Watters & Colflesh, for appellant.

Edward L. O'Connor, Attorney General, L. W. Powers, and Clair E. Hamilton, for appellees.

Mitchell, J.—The State of Iowa and Leo J. Wegman, Treasurer, as plaintiffs, commenced this action in equity, seeking an accounting, and for judgment against the Standard Oil Company of Indiana, in the amount of certain gasoline tax fees alleged to have been illegally refunded by the State to the said defendant between November of 1927 and June of 1933.

In addition to a general denial, the defendant pleaded other defenses, which will be discussed later in this opinion. Judgment was entered for $116,982.11, with interest. The defendant, being dissatisfied, has appealed to this court.

The original Iowa gasoline tax law (chapter 6, Laws of the 41st General Assembly, regular session, 1925) required a distributor of gasoline to pay on or before the 20th day of each month the tax on the number of gallons of gasoline actually sold or otherwise disposed of by him during the preceding calendar month. It appears there was some difficulty in the collection of the tax, and the 42d General Assembly saw fit to amend the act. It recognized the fact that motor vehicle fuel is not produced in the state of Iowa and that which is used in this state comes in

from outside. It therefore required that the tax be paid by the person who first received the motor vehicle fuel, and that such person, if he does not use the fuel himself, collect the tax from the person to whom it is sold, to the end that the ultimate user of the motor vehicle fuel will pay the tax.

Section 5093-a5, Code of 1931, is as follows:

"On or before the twentieth day of each calendar month each distributor of motor vehicle fuel shall file in the office of the treasurer of state, at Des Moines, Iowa, a duly acknowledged report on forms prescribed and furnished by said treasurer, showing the total number of gallons of motor vehicle fuel * * * imported by him during the preceding calendar month, the date of receipt, unloading point, tank car identification and invoiced gallonage of each and every tank car or other receptacle in which motor vehicle fuel is imported into the state of Iowa. * * * At the same time he shall remit to the treasurer the amount of the license fee for such preceding month; provided, however, that in computing said amount a deduction of three per cent of the invoiced gallonage imported may be made for evaporation and loss."

It will be observed from the foregoing section that each distributor is required to make a report showing: (1) the date of receipt, (2) unloading point, (3) tank car identification, (4) invoiced gallonage of each, (5) tank car or other receptacle in which motor vehicle fuel is imported into the state of Iowa. The Treasurer of the state, following the enactment of this statute and in pursuance thereof, prepared forms which he furnished to distributors for the purpose of making the report required by the section above set out. The Standard Oil Company of Indiana, in common with every other distributor—in number approximately seven hundred—listed each tank car in which motor vehicle fuel was imported into the state, showing, as the statute required and as the form provided, the invoiced gallonage of each tank car received by it in this state from outside, and from the total invoiced gallonage contained in the tank car a deduction of three per cent was made and the motor vehicle fuel tax computed on the balance of the invoiced gallonage.

There is no complaint made that the appellant did not properly pay this tax.

Some time after the act was passed the attention of the then

State Treasurer was called to the fact that the invoiced gallonage at point of origin of shipment, namely at the oil refinery, outside the state of Iowa (being the gallonage loaded into the tank car at refinery) was considerably different than the gallonage which was contained in the tank car when it finally arrived at its point of destination in the state of Iowa and came to rest for the purpose of being unloaded. This difference is due to the fact that gasoline is usually loaded at the refinery at sixty degrees temperature. The result is that if the fuel is shipped in cold weather and the temperature of the fuel when unloaded is much lower than it was when it was loaded, the volume will be much less, even tho there has been no evaporation. On the other hand, if the fuel is unloaded at a time when the temperature is higher than it was at the time it was loaded, there is likely to be more fuel in the car than shown by the invoiced gallonage. The Standard Oil Company of Indiana, the Phillips Petroleum Company, and one or two other distributors, filed refund claims for the alleged motor vehicle fuel license fee exacted by the State Treasurer on tank car outages (which is the difference between the amount invoiced or loaded at the refinery and the amount actually received) on gasoline lost in transit between the point of origin of shipment outside the state of Iowa and the point of destination of said shipment within the state of Iowa. These four distributors who made the claims for refunds would file their reports on the regular report forms provided by the Treasurer of State, and then, after the tank car outage for the month covered by such report was definitely ascertained, filed refund claims for the tax paid on said outage, being 3 cents per gallon less three per cent, which they had already deducted at the time they made the payment of the tax. In all the Standard Oil Company filed approximately 346 refund claims, which, after being audited and allowed by the State Treasurer, were certified to the State Auditor for payment and were paid out of the motor vehicle tax fund. Twenty-eight of these refunds were made by Leo J. Wegman, present Treasurer of State, but in June of 1933 he refused to pay any more refund claims and in August of that year commenced this suit, seeking to recover judgment for the amount of said refund claims.

I. The first and most important question that confronts us is the construction of chapter 251-A1 of the Code of 1931.

Under the original act, chapter 6 of the Acts of the 41st

General Assembly, adopted in 1925, the legislature left it to the honesty of the dealer to report and pay the tax. There was no provision in that act for reporting the invoiced gallonage. All that the distributor was required to do was to pay the tax on the gasoline that he sold. The difficulty in collecting the tax, and the ability of many to evade payment, no doubt caused the legislature to amend the act, requiring the distributor before the 20th of each calendar month to file a report on a form prescribed by the Treasurer, showing the invoiced gallonage imported by him during the preceding calendar month, the date of receipt, the unloading point, the tank car identification, and invoiced gallonage of each and every tank car or other receptacle. The statute further provided that at the time of making the report the distributor was to remit to the Treasurer of State the amount of license fee for the preceding month, providing, however, that in computing the said amount a deduction of three per cent of the invoiced gallonage imported could be made because of evaporation and loss.

■■■ The dispute in this case concerns the words "invoiced gallonage imported". It is the contention of the appellant that it is permitted to deduct three per cent from the unloaded gallonage, whereas the appellees contend that appellant is permitted to deduct three per cent from the "invoiced" gallonage, that being the amount which was loaded in the tank car at the refinery. The term "invoice" is defined in 33 Corpus Juris, 811, as follows:

"An account or catalogue of goods, with the value, marks, or particular description thereof annexed; a list of goods sold and the prices charged for them, or the goods consigned and the value at which the consignee is to receive them; a list or account of goods or merchandise sent or shipped by a merchant to this correspondent, factor, or consignee, containing the particular marks or each description of goods, the value, charges, and other particulars; a list or catalogue of property merely; a list sent to a purchaser, factor, consignee, etc., containing the items, together with the prices and charges, of merchandise sent or to be sent to him; a mere detailed statement of the nature, quantity, and cost or price of the things invoiced; a statement on paper concerning goods sent to a customer for sale or on approval; a written account of the particulars of merchandise shipped or

sent to a purchaser, consignee, factor, etc., with the value or prices and charges annexed; a writing made on behalf of an importer, specifying the merchandise imported, and its cost or value. An invoice usually contains the price of the goods sent, the quality, and the charges upon them made to the consignee.''

In Southern Fire Insurance Company v. Knight, 111 Ga. 622, 36 S. E. 821, the meaning of the word "invoice" was considered. We quote from page 824:

'' 'Invoice' has been defined to be: 'A statement on paper concerning goods sent to a customer for sale or on approval. It usually contains the price of the goods sent, the quantity and the charges upon them made to the consignee.' Enc. Dict. 'A list or account of goods or merchandise sent or shipped by a merchant to his correspondent, factor, or consignee, containing the particular marks of each description of goods, the value, charges and other particulars.' Black, Law Dict. 'A list sent to a purchaser, factor, consignee, etc., containing the items together with the prices and charges, or merchandise sent or to be sent to him.' Standard Dict.''

In Pierce v. Southern Ry. Co., 120 Cal. 156, 47 Pac. 874, 877, 52 Pac. 302, 40 L. R. A. 350, it is said:

''The term 'invoice price' * * * meant the cost or value of the property at the shipping point.''

The legislature knew that there was a shrinkage in gasoline, depending upon the temperature at the time the gasoline was loaded and unloaded, and the act now before us provided for the deduction of three per cent from the ''invoiced gallonage imported'' for the purpose of covering evaporation and loss. This is not a case where there was a tax imposed upon gasoline which was not imported into the state, for this record shows without any dispute that the loss due to shrinkage or evaporation or whatever you may call it, from the loading point at the refinery to the unloading point in Iowa, was .59 of one per cent, whereas the amount the statute permitted the distributor to deduct is three per cent. If you adopt the construction advanced by the appellant it necessarily follows that you must strike from the statute the words ''invoiced gallonage''. The legislature certainly had a purpose in mind in using the word ''invoiced''. The

only construction that can be placed upon the statute, to give any meaning to the term "invoiced", is to say that the "invoiced gallonage imported" means the gallonage shown by the invoice at the time the car was loaded at the refinery. The "invoiced gallonage" is the amount placed in the tank car by the refinery at point of loading. The gasoline was not invoiced when it crossed the state line, nor was it invoiced at the time it reached its destination and was unloaded. The invoice was made at the time the car was originally loaded.

The purpose of knowing the "invoiced gallonage" can be readily understood. It was no doubt inserted for the purpose of helping the state officials in properly checking the amount of gasoline which came into Iowa. If the state officials had to check every car, the task would be an impossible one. Thousands of cars of gasoline are shipped into Iowa. There is no way that the officials of this state, charged with the collection of this tax, could measure every one of these cars. Upon the honesty of the individual or corporation that receives the shipment depended the accuracy of the amount reported. To provide a method which would be simpler and more efficient, the legislature provided for the reporting of the "invoiced gallonage", not the unloaded gallonage, but the gallonage when the car was originally loaded, known to the trade as the "invoiced gallonage".

■■■ II. The next contention of the appellant is that the construction placed upon the statute by the Treasurer of State, being the executive official charged with the duty of administering the law, demonstrates that the legislature intended the tax to be paid upon the unloaded or imported gallonage after deducting three per cent for loss and evaporation, and that this construction should not be disturbed by the court.

With this we cannot agree. The principle that great weight should be given to the construction placed upon statutes by those charged with their administration, has been frequently announced by this court, and the long-settled practice or custom adopted by the executive department will not be disturbed if the statute is ambiguous and reasonably susceptible to the construction adopted by the executive department. In the case at bar, as we read this record, the Treasurer of the State did not place the construction upon this statute that appellant now desires. The Treasurer of State at all times required the appellant and other distributors to report upon a form provided by him. We

find that form, a copy of which is in the record before us, provided that the distributor report:

(1) Invoiced gallonage of motor vehicle fuel imported into Iowa

-------------------------------------------------------------------

------------------------------------------------------------------- .....................

Deductions

(2) Gallonage sold and delivered outside the State of Iowa .....................

(3) Gallonage sold and delivered in the State of Iowa (deduct 2 from 1) .....................

(4) Evaporation and loss (not to exceed 3% of gallonage reported as Item 3) .....................

Thus it appears that from the very beginning, covering all of these years, the Treasurer of the State has required not only this appellant but more than seven hundred distributors doing business in Iowa, to file a form in which he permitted the deduction of three per cent of the "invoiced gallonage". It will be noted that the first requirement in the report is the number of the invoiced gallons of motor vehicle fuel imported into Iowa. That was the gallonage as shown by the invoice at the time the car was loaded at the refinery. The distributor is then permitted under the report to deduct the gallonage delivered outside the State of Iowa. Then (3) of the report directs that he state the gallonage sold and delivered in the State of Iowa, and in parenthesis says to "deduct 2 from 1", 2 being the gallonage sold and delivered outside of the State of Iowa, and 1 being the invoiced gallonage. When that figure has been ascertained the distributor is then permitted, under (4) to deduct the three per cent for evaporation and loss. So there has been a uniform, constant and continuous interpretation of that section of the Code contrary to the views now claimed by this appellant. In addition to that, this record shows that refund claims were allowed only to the Standard Oil Company of Indiana, Phillips Petroleum Company and one or two other distributors. It is true that these companies imported practically forty per cent of the gasoline used in Iowa, but if these companies were entitled to refunds, then all of the other distributors were also entitled to refunds. And the Treasurer of this State during all of these years did not allow refunds to any except the ones herein set out. It is

claimed there was an understanding between the then Treasurer of State and these companies receiving the refund that they were to file reports, pay the tax, and were then to file claims for refund; that their claims would then be allowed. But we find nothing in the law that would authorize the Treasurer of State to make these refunds.

The provisions of section 5093-a5, Code of 1931, authorizing refunds, is as follows:

"If, after the prescribed license fees are so remitted and paid, any motor vehicle fuel in the possession of a licensed distributor is destroyed by fire, lightning, storm or accident not caused by the fault of such distributor or any employee thereof, before being sold or used by him, upon proper application therefor and proof of such destruction or loss satisfactory to the treasurer of state, the said treasurer is authorized to certify to the amount of the license fees so paid thereon to the auditor of state as a refund. The auditor of state shall issue his warrant drawn on the motor vehicle fuel fund in payment thereof and the same shall be paid in the same manner and from the same fund as those refunds authorized in section 5093-a8."

Further provision with reference to refunds is found in section 5093-a8, as follows:

"Any person who shall buy or use any motor vehicle fuel for the purpose of operating or propelling stationary gas engines, tractors used for agricultural purposes, motor boats, airplanes or aircraft, motor vehicles, trucks and tractors owned and operated by the state of Iowa, or by a municipality for municipal purposes within the state, or who shall purchase or use any motor vehicle fuel for cleaning or dyeing, or for any other commercial use except for propelling motor vehicles operated in whole or in part upon the public highways of the state or upon the streets of any city or town in the state, shall be reimbursed and repaid the amount of such license fee paid by him, upon presenting to the treasurer of state a statement accompanied by the original invoices showing such purchase which statement shall set forth the total amount of motor vehicle fuel so purchased, paid for and used by such consumer other than for propelling motor vehicles operated or intended to be operated in whole or in part upon any of the public highways of this state

or upon the streets of any city or town of this state and the treasurer of state shall, upon the presentation of such invoice, cause to be repaid from the funds collected hereunder, the amount of such license fee paid by such consumer on motor vehicle fuel used for purposes other than propelling motor vehicles as hereinbefore provided. All applications for refunds or reimbursements as provided for in this chapter shall be filed with the treasurer of state on blank forms provided by him for that purpose within ninety days after the date on which such motor vehicle fuel shall have been purchased as shown by the invoice. Any person, firm, or corporation who shall make any false statement in connection with an application for the refund of any money or license fee as herein provided or who shall collect or cause to be repaid to him or any person, any such fees, without being entitled to the same under the provisions of this section shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not to exceed one thousand dollars.''

There is no claim made that this appellant came under the provisions of these refund statutes. Claims on which it procured funds from the public treasury were not such that showed that gasoline which it had received and on which it had paid the tax, had been destroyed by fire or other unavoidable hazard as required by section 5093-a8. Nor can it be said that the gasoline on which it sought a refund was gasoline ''used for the purpose of operating or propelling tractors used for agricultural purposes or stationary gas engines, motor boats, airplanes or aircraft, or for cleaning or dyeing, or for any other commercial use.'' In fact, the claims filed show upon their face that they were not for these purposes. The ordinary form furnished by the Treasurer of State was used, and in this form, under heading numbered 4, we find that after

''Purpose for which Motor Vehicle Fuel for which reimbursement is claimed was used (if in tractor, explain for what tractor was used),''

appellant inserted the following:

''Difference between invoiced gallonage and measured gallonage for month of ........................''

It is not the claim of the appellant, as we understand it, that it came under the refund statutes. Its position is that the payment of the claim is but the return of a tax illegally collected in the first instance, and is but the adjustment of an error in the collection of the tax.

The fallacy of this contention is apparent when it is borne in mind that appellant paid motor vehicle fuel taxes on only 97 gallons for each 100 gallons shown by the invoices, and that it actually received 99.41 gallons for each 100 gallons shown by invoices. It follows, therefore, that according to the appellant's own figures and its own measurements of the contents of tank cars, for every 97 gallons on which it paid the tax it received 2.41 gallons on which no tax was paid. It must be always kept in mind that appellant did not pay this tax; it was paid by the final user of the gasoline, and at that time the appellant collected 3 cents upon each gallon.

 III. The appellant next contends that if the construction advanced by the State and adopted by the trial court is approved by this court, the license fee or tax imposed would constitute a burden upon interstate commerce since it would put a tax on fuel in interstate commerce, in contravention of Section 8, Article I, of the Constitution of the United States.

This very law was before the Supreme Court of the United States in the case of Mona Motor Oil Company v. Johnston, 292 U. S. 86, 54 S. Ct. 575, 578, 78 L. Ed. 1141, where at page 1147, this court said:

"There is no substance in the claim that the statutes impose a burden upon interstate commerce, contrary to the prohibition of Article I, Section 8 of the federal Constitution. The appellant insists that the tax is a direct tax on motor vehicle fuel imported. The court below concluded that the law laid an excise upon the use of fuel for the propulsion of vehicles on the highways of the state. The state officials have administered the tax on this theory. We think this the correct view. The levy is not on property but upon a specified use of property. Altitude Oil Co. v. People, 70 Colo. 452, 202 Pac. 180; Standard Oil Co. v. Brodie, 153 Ark. 114, 239 S. W. 753. It is not laid upon the importer for the privilege of importing (compare Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678; Bowman v. Continental Oil Co., 256 U. S. 642, 647, 65 L. Ed. 1139, 1144, 41 S. Ct. 606), but falls on the

local use after interstate commerce has ended. Compare Sonneborn Bros. v. Cureton (Sonneborn Bros. v. Keeling), 262 U. S. 506, 67 L. Ed. 1095, 43 S. Ct. 643; Nashville, C. & St. L. R. Co. v. Wallace, 288 U. S. 249, 77 L. Ed. 730, 53 S. Ct. 345, 87 A. L. R. 1191; Edelman v. Boeing Air Transport, 289 U. S. 249, 77 L. Ed. 1155, 53 S. Ct. 591. The statute in terms imposes the tax on motor vehicle fuel used or otherwise disposed of in the state. Instead of collecting the tax from the user through its own officers, the state makes the distributor its agent for that purpose. This is a common and entirely lawful arrangement.''

And in the case of Gregg Dyeing v. Query, 286 U. S. 472, 76 L. Ed. 1232, 52 S. Ct. 631; 84 A. L. R. 831, the court, at pages 836-7, said:

''As to interstate commerce, the questions are (1) whether the Act as applied by the state court imposes a direct burden upon that commerce and (2) whether, although the subject of the tax would otherwise be within the power of the State, the tax is invalid because it creates an unconstitutional discrimination against transactions in interstate commerce.

''As to the first question, we are not concerned with what the tax is called, but with what the statute does. It imposes an exaction with respect to gasoline purchased in other States and brought into South Carolina and there placed by appellants in storage for future use within the State. By the terms of the Act, as construed by the state court and applied to these appellants, interstate commerce in relation to the subject of the tax has ended. The gasoline has come to rest within the State, having been placed in appellants' storage tanks, and added to appellants' property kept for local purposes. In such circumstances the State has the authority 'to tax the products or their storage or sale.' Texas Co. v. Brown, 258 U. S. 466, 478, 66 L. Ed. 721, 727, 42 S. Ct. 375; Sonneborn Bros. v. Cureton (Sonneborn Bros. v. Keeling), 262 U. S. 506, 519, 520, 67 L. Ed. 1095, 1102, 43 S. Ct. 643; Hart Refineries v. Harmon, 278 U. S. 499, 501, 502, 73 L. Ed. 475-477, 49 S. Ct. 188. Not only may local sales of gasoline thus brought into the State be taxed, but its use as well. This was specifically determined in Bowman v. Continental Oil Co., 256 U. S. 642, 648, 649, 65 L. Ed. 1139, 1145, 41 S. Ct. 606. See Hart Refineries v. Harmon, 278 U. S. 499, 73 L. Ed. 475, 49 S. Ct. 188, supra; George E. Breece Lumber Co. v. Asplund,

283 U. S. 788, 75 L. Ed. 1415, 51 S. Ct. 352. There is an exception in the case of a tax directly on use in interstate commerce, as on use in interstate transportation. Helson v. Kentucky, 279 U. S. 245, 252, 73 L. Ed. 683, 687, 49 S. Ct. 279; Eastern Air Transport v. South Carolina Tax Commission, decided March 14, 1932 (285 U. S. 147, 76 L. Ed. 673, 52 S. Ct. 340). In view of these well-established principles, we find no ground for concluding that the State could not impose the tax with respect to the gasoline of appellants which was kept within the State for use in their local enterprises. As the Court said in Hart Refineries v. Harmon, 278 U. S. 499, 73 L. Ed. 475, 49 S. Ct. 188, supra, interstate transportation having ended, the taxing power of the State in respect of the commodity may, so far as the commerce clause of the Federal Constitution is concerned, 'be exerted in any way which the State's constitution and laws permit.' This, of course, is on the assumption that the tax does not discriminate against the commodity because of its origin in another state.''

Then the appellant also forgets that, under this record, there was no tax charged upon gasoline which did not come into the State of Iowa. The truth of the matter is only 97 gallons of every 100 gallons invoiced were taxed, whereas 99.41 gallons were received. In other words, appellant received 2.41 gallons on which it paid no tax. The State had a right to fix the motor vehicle fuel tax. It could have placed it at 6 cents. It could have said there would be so much tax on each half-gallon. The tax is levied only on motor vehicle fuel used in Iowa. No question under the federal Constitution is or can be involved.

■■■ IV. The appellant next contends that the lower court erred in entering judgment against it for interest on the refunds from the date that they were made until the date of judgment. The statute under which appellee sought interest is section 9404 of the 1931 Code, which provides for the payment of interest where no contract, loan, or account is involved, in only the following situation:

''2. Money after the same becomes due.''

This case is not one involving failure to pay an obligation after the same became due. The tax was paid when due. No demand for the return of the tax was ever made. The return of a portion of the money to the companies who paid the tax does not

1222

put them in the class of the defaulting debtor. The answer is, the companies met their obligations when due and a subsequent return of the money under a mistaken interpretation of the tax law by a State official does not render the companies liable for the payment of interest when they are ordered to return the refund. This is an action in equity, and it would seem hardly fair and just to say that since the refund was granted by the State Treasurer the State should be allowed to capitalize on the mistake of its officer. It therefore follows that the lower court was wrong in entering judgment for interest from the date the refunds were made, as interest should be charged only from the date that the decree was entered in the lower court. This case is remanded to the lower court, with instructions to enter judgment in the amount of $93,400.79, with interest thereon from November 26, 1934, and the costs of this action.—Affirmed in part; reversed in part.

RICHARDS, C. J., and ANDERSON, PARSONS, HAMILTON, and STIGER, JJ., concur.