STATE *ex rel.* RICE *v.* REPUBLIC OIL REFINING Co.

(Division B. Oct. 27, 1947. Suggestion of Error Overruled Nov. 10, 1947.)

[32 So. (2d) 290. No. 36494.]

**Greek L. Rice,** Attorney General, by **James T. Kendall,** Assistant Attorney General, for appellant.

**W. D. Conn, Jr.,** of Jackson, and **Campbell, Houck & Thomas** and **Harland I. Casteel,** all of Pittsburgh, Pa., for appellee.

**L. A. Smith, Sr., J.** delivered the opinion of the court.

The State of Mississippi, on the relation of the Attorney General, sued Republic Oil Refining Company in the Chancery Court of Washington County for recovery of certain

allegedly unpaid gasoline taxes, and penalty claimed to have become due prior to later legislation on the subject in 1946. From an adverse decree, the State prosecuted this appeal.

Appellee was sued as a qualified distributor of gasoline, oil, and other products in Mississippi, on the claim that from August 31, 1941, to April 1, 1946, it had imported, received and stored in Mississippi 70,854,056 gallons of gasoline, while it had reported and paid taxes on only 70,176,994 gallons during such period. This gasoline was conveyed into the State from points of origin in Texas and Louisiana by means of common carrier barges, and consigned to appellee, unloaded at Greenville into its storage tanks and thereafter sold, distributed, and used in the State of Mississippi, so the bill of complaint avers.

The bill further predicated the State's claim upon the charge that Section 10017, Code 1942, levied an excise tax of six cents per gallon on such gasoline so received, stored, and sold in this State for certain named purposes. It claimed also that such "tax was levied and imposed upon such distributor for the privilege of engaging in the business of and acting as such distributor." The State further charged that said section prescribes that the basis for determining such tax liability is the "correct invoiced gallons, adjusted to 60 degrees F. at the refinery or point of origin of shipment." Continuing its claim, the bill avers that Section 10018, Code 1942, provides that such tax is to be abated or reduced by a deduction of two per cent for loss by evaporation, spillage, and other causes, including temperature adjustments.

Instead of reporting to the state the correct total gallonage at the points of origin, the 70,854,056 gallons, the bill charges, the appellee reported only the 70,176,994 gallons. It is pleaded that appellee used, as a basis for computing the amount of tax due, the gallonage, "actually unloaded into its shore storage tanks as computed by the measurment or gauge of such tanks before and after unloading." The difference of 677,062 gallons, thus

claimed to have escaped taxation in violation of the statutes because not reported to the Motor Vehicle Commissioner, forms the predicate of the appellant's demand against appellee in this suit. The state's calculation is that the tax thereon at six cents per gallon, "after giving credit for the two per cent deduction allowed by statute for evaporation, spillage and other causes" is $39,811.26, plus a penalty of 25 per cent thereon, as required by Section 10020, Code 1942, making its total demand here $49,764.80.

The theory of the state as to the purpose of the Leglature in granting the two per cent deduction, supra, is that it was "intended by the law to cover losses and discrepancies in the gasoline while being transported," which was all the alowance appellee was entitled to receive, and it was not entitled, therefore to any further deduction for actual loss between points of origin of the shipments and the storing in its shore-storage tanks, which was figured at .955%. The original bill charges this two per cent deduction was, accordingly, more than sufficient to take care of such amount lost in transportation between shipment and storage.

The prayer of bill seeks a decree of $49,764.80 and a lien on appellee's properties, as provided in Section 10055, Code 1942, and general relief.

Appellee, by its answer, denies that Section 10017, Code 1942, has not received its compliance. It avers that "it . . . has paid excise taxes on every gallon of gasoline, less statutory deductions, which has been delivered to it into its storage tanks in this state from such barge shipments and on every gallon of gasoline which has been available to it for storage, sale, distribution or for any other use in this state." Appellee says, further, that it is necessary to pump the gasoline under high pressure, through pipes from the barges to the storage tanks on shores; and that for various reasons it is generally practically impossible to pump from the barges the entire contents of gas into the storage tanks ashore.

Appellee points out in its answer that its storage tanks were gauged and calibrated by experts, whose tables and temperature charts were made available to the Motor Vehicle Commissioner, since thereby it was made possible to determine the actual gallonage of gasoline in the storage tanks at any time. It also averred that a gallon of gasoline is recognized as 231 cubic inches at 60 degrees F. The Commissioner, thereupon, authorized appellee to report only the correct receipts into the shore-storage tanks, and pay the tax on the same, less statutory deductions.

Answering further, appellee said that at each and every unloading of barges into its shore-storage tanks the Motor Vehicle Commissioner was represented by a field agent, who properly determined, then and there, the exact number of gallons of gasoline actually stored. On the calculation by this state agent, appellee says it based its report and payment of the tax to the Motor Vehicle Commissioner, less statutory deductions, the same being in the correct amount due at the required legal rate.

Appellee makes certain further averments of other supervisions under the direction of a Certified Tankerman, licensed by the United States Bureau of Marine Inspection, all leading to results of accuracy of its report and tax liability, at the tanks. The answer admits that the total number of gallons of gasoline originally invoiced to it by the refineries or other points of origin were 70,854,056; but claims that the total amount received in its storage tanks in Mississippi for sale, use on the highways, storage, distribution, use in internal combustion engines, and all other purposes was 70,176,994 gallons, which was determined to be correct by the means and agencies set out, ante. Appellee explains that it has not reported or paid taxes on the difference between the above two amounts, 677,062 gallons, because it was not received in this state, and it owes no tax on said difference.

Appellee denies, in its answer, that the laws of this state contemplate that evaporation, spillage or other loss of

gasoline occurring while in transit and before its receipt into its storage tanks in Mississippi, for use as above set out, is covered by the two per cent provided in Section 10018, Code 1942. It takes the position that the two per cent refers to evaporation, spillage, and other losses occuring in this state after the gasoline has been pumped into its storage tanks for the uses set out, supra. It further charges it was not due to report the 677,062 gallons accordingly, and hence owes the state nothing claimed by the original bill.

We have thus carefully set out the complaint of the state and the defense of Republic Oil Refining Company, appellant and appellee, respectively, in order to disclose their respective divergent constructions of their rights and liabilities under the statutes involved. The case was tried on an agreed statement of facts, which substantially follows the several allegations of the pleadings, except in some details, and except as to legal propositions.

We state the agreed facts only where they are not set out in the bill and answer, or where they are inconsistent with, or in addition to, the averments in such pleadings.

With this preface, we summarize additionally from the agreed statement of facts that appellee did not sell, distribute, store, or make use of any of the gasoline or other petroleum products except that delivered into its shore-storage tanks at Greeneville; neither the competency of their agent in preparing the "gauge tables" nor the correctness of them and the temperature charts, are denied, and they are accepted as entirely accurate; the Motor Vehicle Commissioner agreed to and did accept the shore-tank measurments as certified by his field agents. It was further agreed that the gauge tables and temperature charts have been used to compute the quantity of gasoline and other petroleum products delivered into the shore-tanks. This continued until some time in July 1945, when, acting on the advice of the Attorney General, the Commissioner "demanded that all distributors receiving gasoline and other petroleum products in barge

cargoes report and pay the tax on the number of gallons invoiced to them at the refinery or point of origin, irrespective of the number of gallons actually received by them in their storage tanks.'' This appellee declined to do, but continued to report and pay the tax as theretofore.

The 677,062 gallons, the basis of this suit, were never received in appellee's storage tanks and were not sold, distributed, used on the highways or in internal combustion engines, or for any other purpose, in Mississippi, and appellee neither reported nor paid taxes thereon. For various reasons, as a general rule, it is physically impossible to exhaust completely the cargoes of barges by pumping into the storage tanks, which sometimes causes larger amounts to be pumped into the storage tanks than were invoiced at the points of origin. When this condition existed appellee reported and paid on such gallonage as was actually in excess of the invoices. In this connection, it was agreed that ''the 677,062 gallons of gasoline difference between the invoiced gallonage at the refinery or points of origin and gallonage actually delivered into Republic's storage tanks either remained in such barges and was not pumped therefrom or was lost during the course of transportation, or during the course of pumping same from the barges into the storage tanks by reason of evaporation, leakage, spillage, or other causes; that such difference between invoiced gallonage at the point of origin and the amount delivered to Republic's storage tanks amounted to .955% of the invoiced gallonage of the gasoline at its point of origin.'' Appellee used at all times the gallonage stored in its tanks and deducted therefrom the statutory allowance of two per cent for loss by spillage, evaporation and other causes, including temperature adjustments, and paid the tax of six cents per gallon on the remainder.

It was further agreed that the ''purpose of having such field representative of agent (of the Motor Vehicle Commissioner) present was to determine the actual number of gallons actually delivered into the distributor's

storage tanks so that the Commissioner might check such amounts with and against the number of gallons which said distributor reported upon its monthly reports and with and against the number of gallons shown to have been invoiced to said distributor at the refinery or other points of origin.''

Among other things, Section 10017, Code 1942, provides:

''Provided, that the tax herein imposed and assessed shall be collected by and paid to the state of Mississippi but once in respect to any gasoline or oil, and the basis for determining the tax liability shall be the correct invoiced gallons, adjusted to 60 degrees F. at the refinery or point of origin of shipment. . . .

''Provided, that whenever a bonded distributor of gasoline or oil has made the report of the receipt of, and paid all excise taxes due on, gasoline or oil received in the state as required by law, and after receipt in this state thereof, sells any of such gasoline or oil to another bonded distributor or dealer, who is required to make report of his receipts to the motor vehicle commissioner, the commissioner shall collect from such subsequent bonded distributor or dealer the gasoline or oil taxes on all gasoline and oil received by him, even though the taxes may have theretofore been paid on a part or all of such gasoline or oil; and shall allow credit therefor to the original bonded distributor who has paid the taxes thereon on his report or any succeeding monthly report. Provided that nothing in this act shall prevent any subsequent bonded distributor from paying the tax to the original bonded distributor at the time of purchase of any gasoline or oil.''

It is to be borne in mind that it is admitted by the agreed statement of facts that the total number of gallons of gasoline received by appellee into its storage tanks at the point of the destination of the shipments was 70,179,944 gallons adjusted to 60 degrees Fahrenheit, and

that appellee paid the six cents tax on every gallon so received, less the statutory deduction therefrom of two per cent. It is admitted that the measurements of the receipts were made under the constant and uninterrupted personal supervision of the agent of the State placed. there for that purpose. There is no sort of suggestion that these receipt measurements were not absolutely correct.

It would seem that the foregoing statement ought to put an end to any further demand by the State, but the State says that the total gallonage invoiced to appellee during the period in question was 70,854,506, and that appellee is liable on the difference of 677,062 gallons, and when the State is confronted with the statute which makes the basis of the computation that it "shall be the correct invoiced gallons, adjusted to 60 degrees F. at the refinery or point of origin of shipment," the State says that when the statutory two per cent is deducted from the total gallons invoiced this makes the "correct invoiced gallons" contemplated by the statute. In short, the State would make the statute read "corrected invoiced gallons" instead of "correct invoiced gallons," the correction being made by the two per cent aforesaid.

To illustrate the State's argument: If the shipper's invoice was for 10,000 gallons the 2% would be applied so as to correct it to 9,800, gallons upon which appellee would be liable in spite of the fact that the shipment when received and measured by the State's own agent on the ground showed only 9,500 gallons,—in which connection it is interesting to note that the State in its brief is careful to reserve the point that if the shipper's invoice showed less than the gallons received, appellee would be liable on the gallons received rather than upon the invoiced gallonage. And further in this connection, it is interesting to note that it is admitted that in seven shipments during the period the gallons received were more than shipper's invoices for the particular shipments, running each from 414 to 2,770 gallons more, and the State in each

case accepted payment on the gallons received rather than upon the invoices.

The six cents a gallon tax is not upon appellee or other distributors either at wholesale or retail, but is upon the ultimate consumer; is a use tax for the use of the public highways by the consumer and is not to be collected for uses other than upon the public highways. The retail dealer in selling to the consumer adds the six cents to that which would otherwise be the price of the gasoline provided the gasoline is to be used on the public highways, and the retailer remits the six cents to the State, which, in turn, reimburses the wholesaler, such as appellee, who has already paid the tax in advance to the State.

The wholesaler actually receives, say 10,000 gallons. He remits to the State the six cents' tax on 9,800 gallons. He ships the 10,000 gallons to a retailer. The retailer collects six cents tax from the consumer but in remitting to the State he takes the two per cent statutory reduction or remits on 9,800 gallons, which payment is then remitted to the wholesaler, who has already paid the tax on the 9,800 gallons. Thus the tax is paid by the consumer as a use tax, the previous payment by the wholesaler being in the nature of an advancement and to guarantee the State against any black market maneuvers between the time the gasoline is received by the wholesaler and then and there measured by the State's agent on the ground and the time it is received and paid for by the legitimate consumer at the pumps of the retailer. And the two per cent is allowed for evaporation and as to which is to some extent bound to occur in the retailing process,—in the process of the transfer from the wholesaler's storage tank until the gasoline actually gets in the tank of the consumer's vehicle.

The two per cent deduction in gallonage is in its ultimate effect an allowance to the retailer, who for his actual gallonage received, deducts the two per cent which is then passed back to the wholesaler as above illustrated,

and is not for any such use as a device to correct the original shipper's invoice as contended for by the State.

The State argues, it will be observed, that the basis for determining the tax liability shall be the correct invoiced gallons at the point of origin, and this is the language of the statute. However, it must not be overlooked that the word "correct," in this provision, means what it signifies. How is this invoice to be tested for accuracy? An excellent method has been followed by appellee and the Motor Vehicle Commissioner. Certainly, appellee could not lawfully be mulcted for taxes on gasoline not actually received in Mississippi. In our opinion, the interposition of the word "correct" in the verbage employed implies that the distributor might introduce competent evidence of errors in the invoices, with the privilege to the State to rebut it. This presents an issue of fact, which, in the case at bar, the chancellor decided in favor of the appellee.

The requirements as to monthly reports and remittances are set forth in Section 10018, Code 1942, which also provides that: The excise tax herein provided shall be paid upon all of the gasoline and oil or either, manufactured, refined, distilled, blended, compounded, purchased, acquired, received or stored by said distributor during the preceding month, less two per cent (2%) for loss by evaporation, spillage and other causes on gasoline, including temperature adjustments. Attention is called to the use of the word "stored," as allocating to the gasoline "stored" the two per cent deduction, instead of the invoiced gallonage as contended by the State. The State contends that the two per cent deduction is to be based on the invoices and was provided to take care of all evaporation, spillage, and losses from other causes, including temperature adjustments. This never exceeded .955%. It is argued, therefore, that appellee's claim that to owe no duty to report or pay on the figures, 677,062, is invalid and in contravention of the statute. We are of the opinion that this view of the State is erroneous, and contrary to the clear intendment of the statute. The appellee's

contention that in the phrase "correct invoices" at the points of origin as the basis for determining the tax, the use of the word "correct" refutes any argument that mere invoices are conclusive. We think this is true, and that appellee thereby is granted the right to challenge the correctness of the invoices. The invoices are merely the "basis," and inconclusive of their own correctness, as we see it.

In support of its position, the State cites to us State of Iowa, etc. v. Standard Oil Co., 222 Iowa 1209, 271 N. W. 185, 188, as authority for its interpretation that the Iowa statute required, as it is claimed the Mississippi statute does, that the gasoline taxes should be paid by distributors upon invoices rather than upon sales. It is argued that the Iowa statute provided that the distributor should report each month the "invoiced gallonage" of each and every tank car or other receptacle in which motor fuel is imported into the State of Iowa, and provided further that such distributor should remit the amount of the license fee with his report, and that in computing said amount a deduction of three per cent of the invoiced gallonage imported may be made for evaporation and loss. The case revolved around refunds claimed by and paid to the Standard Oil Company for the difference between the amount invoiced and loaded at the refinery and the amount actually received by it. The state officials later, conceiving these allowances to have been erroneously made, sued for their recovery, and judgment was entered in favor of the state accordingly, and affirmed on appeal. In the cited case, the Iowa court used this language: "The Legislature knew that there was a shrinkage in gasoline, depending upon the temperature at the time the gasoline was loaded and unloaded, and the act now before us provided for the deduction of 3 per cent from the 'invoiced gallonage imported' for the purpose of covering evaporation and loss." Attention is called to the absence of the word "correct" here, which word is conspicuous in the Mississippi statute. Attention is called

to the allowance of the three per cent specifically from the invoiced gallonage imported. In this State, as we view it, the deduction of the statutory two per cent is on the gasoline actually pumped into the storage tank, and any difference between the invoice and the storage is available as evidence to challenge the correctness of the invoices. The Iowa court, in the course of its opinion, made the significant observation that "this is not a case where there was a tax imposed upon gasoline which was not imported." The statutes of the two states are, in important aspects, fundamentally different, and we see nothing in this Iowa case that should lead us to a different conclusion than the one we have reached.

Appellee cites the case of State Tax Commission v. Associated Oil & Gas Co. et al., 98 Utah 474, 100 P. (2d) 966, 967, which we think is of value here. In that case, the Utah Court said that the applicable statute specifically provides that persons shipping motor fuels into the state " 'shall report the total amount received for sale in this state and from such amount there shall be deducted three per cent.' "

Our statute declares that the basis for the determination of the tax shall be the correct invoices at the points of origin, but it did not provide that the tax should be computed solely on such invoices. It merely directed that such invoices be the basis, and by the use of the word "correct" granted distributors the right to show the incorrectness of the invoices. The tax was to be and was here imposed on the correct gallonage brought into Mississippi, therefore. Here, competent evidence developed that the invoices involved were not correct in certain instances, sometimes too little and sometimes too much.

As pointed out, there is nothing in Section 10017 to prevent the State exacting report and payment of the tax when the unloading shows more gallonage than was invoiced originally. The language used is that "correct invoices" shall be the basis for determining the tax. By the same reasoning, there is nothing in the statute

permitting the State to exact reports and payment of the tax on gallonage certified by its own representative not to have been as much as called for by the invoices, and not received, therefore, in Mississippi. Otherwise, the State is put in the anomalous position of accepting the full import of the phrase ''correct invoices,'' on the one hand, and of deleting the word ''correct'' on the other. So, in our judgment, correct invoices form the basis for determining the tax, but the tax becomes due in Mississippi only upon the gallonage delivered in Mississippi, and if, when checked in Mississippi, as here, the invoices prove correct, then they are conclusive. If, however, they prove incorrect, then the tax is imposed on the correct amount delivered in Mississippi, instead of being fixed by erroneous invoices. On the correct amount so fixed, the statutory deduction of two per cent is allowed. This, we believe, is what the Legislature intended, as the tax could not be levied on the gasoline, extraterritorially, at the point of origin, but only after it gets into Mississippi. It was never intended by the Legislature that the two per cent would act as a corrective of the differential in gallonage between that invoiced and that actually unloaded into storage tanks in Mississippi, in our judgment.

If, as the record discloses, sometimes there are pumped into the storage tanks more gallonage than the invoices at the point of origin call for, (on which excess the State gets a report and payment of the tax); and if, for the reasons set out in the agreed statement of facts, there are, generally, fewer gallons pumped into the storage tanks than invoiced at the points of origin, there is incorrectness somewhere—which is sufficiently shown by the rigid tests and checks at the time of unloading to be in the invoices. The record reveals no check at the point of origin of the invoices. If the invoices, when checked against the gallonage pumped into the storaged tanks, tallied with the amount so pumped into the tanks, we take it acceptably to demonstrate the correctness of the invoices. Then, in cases of discrepancies, we take the careful gauges, charts,

and personal checks at the pumps, as stated, to be competent evidence that the invoices were not "correct." This, of course, would be rebuttable, but there is no rebuttal in this record.

We have given very careful consideration and study to the record and the briefs, and have come to the conclusion that the decree of the chancellor should be affirmed in view of what we have said supra.

Affirmed.