(C. D. 340)

WATSON, GEACH & CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided May 17, 1940)

*Jerome G. Clifford* (*George W. Israel* of counsel) for the plaintiff.
*Webster J. Oliver*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: This is a suit against the United States, arising at the port of New York, brought to recover certain customs duties alleged to have been improperly exacted on a particular importation of so-called silver sulphide ore, which, according to the report of the Government chemist attached to the invoice herein, contained 33.37 per centum of lead. Duty was levied upon such lead content at the rate of 1½ cents per pound under paragraph 391 of the Tariff Act of 1930. It is claimed that said merchandise is entitled to free entry under said paragraph 391, which in part reads as follows:

PAR. 391. Lead-bearing ores. * * * 1½ cents per pound on the lead contained therein: *Provided*, That such duty shall not be applied to the lead contained in copper, gold, or silver ores, or copper mattes, unless actually re-covered: * * *

The sole issue herein presented is whether or not the lead contained in the imported silver sulphide ores was actually recovered, as claimed by the Government.

The plaintiff offered in evidence the testimony of a single witness. No evidence was introduced by the Government.

The witness, Albert Meyer, a qualified metallurgical engineer who for the last 29 years has been assistant superintendent of the Irvington Smelting and Refining Works, the company which purchased the merchandise in question from the importer herein, testified in part as follows:

Q. Will you be good enough to describe the operation of your smelter from the moment that the ore is placed in the first operation, until the entire smelting and refining operation is completed?—A. That ore we smelt in a test furnace, cupel furnace, and we add some pig lead. We run that furnace according to our operations, for about two days. Then we run it down and this lead runs off as litharge lead oxide, and what is left in the furnace is a silver. The litharge we take over to the blast furnace department and use it as a collector of precious metals, gold, silver and platinum. In the blast furnace department we smelt sweepings, jewelers' sweepings. We use the lead as a collector. Then it goes back to the refining furnace.

Q. Is that refining furnace known as the Cottrell furnace?—A. No. Cottrell is a dust collector. It is collected in a Cottrell collector.

Q. Does that dust contain some lead?—A. The dust contains some lead, and precious metals, mostly silver, and impurities, and also this dust goes back again into the process.

 *  *  *  *  *  *  *

Q. How do you lose the lead? What happens to it?—A. In the blast furnace department, we produce a slag, very low grade slag that contains maybe 1 to 2 per cent lead, and a few ounces of silver. This slag is analyzed every day and if it is below a certain amount of silver, then we throw it out.

Q. Do you make any effort to obtain any of the lead that is left in this slag?—A. None at all.

 *  *  *  *  *  *  *

Q. When you first put the ore into the first furnace into the blast furnace, is it necessary to add domestic lead for your smelting and refining operations?—A. Yes, sir.

Q. Is that lead you refer to, pig of lead?—A. Yes, sir.

 *  *  *  *  *  *  *

Q. Do you make any effort to recover this lead?—A. Not at all.

Q. Have you ever recovered any lead?—A. Not at all.

On cross-examination the witness testified in part as follows:

X Q. This ore that you purchase is what you call silver sulphide, isn't it?—A Yes, sir.

X Q. It has a high content of lead, has it not?—A. Yes, sir.

 *  *  *  *  *  *  *

X Q. Do you know that you pay for the lead?—A. Yes, sir, we have to pay for the lead.

X Q. When you first get that, you put it into a smelter?—A. Yes, sir, and the blast furnace.

X Q. In that furnace for how long?—A. According to how much we put on. I would say about two days.

X Q. And then you get the lead off the top, do you?—A. Yes, sir, the lead runs off.

X Q. What do you do with the lead?—A. This goes to the blast furnace department.

\*      \*      \*      \*      \*      \*      \*

X Q. \* \* \* you also add pig lead?—A. Yes, sir.

\*      \*      \*      \*      \*      \*      \*

X Q. Now that pig lead also unites with the lead in the ore, does it not?—A. Yes, sir.

\*      \*      \*      \*      \*      \*      \*

X Q. You draw the lead off?—A. \* \* \* It runs off as a lead oxide.

\*      \*      \*      \*      \*      \*      \*

X Q. Some of the lead that was in the pig, and also in the ore goes up into the flue as dust?—A. Yes, sir.

X Q. And you have a cupel which collects that dust?—A. Yes, sir.

X Q. Then, after you collect that dust, you take it to the Cupel furnace, do you not?—A. The dust goes through the blast furnace department.

X Q. What do you recover from that?—A. In the blast furnace we recover precious metals \* \* \*.

\*      \*      \*      \*      \*      \*      \*

X Q. \* \* \* you use that lead over again, don't you?—A. Yes, sir.

X Q. And you put that in with more ore?—A. That goes through the blast furnace.

X Q. And keep using that until you get all the precious metals?—A. This furnace is in operation for months \* \* \*. At the end of the year, we lose so much lead.

X Q. You don't recover lead as a commercial product? You don't sell it?—A. No.

X Q. But you do recover it so that you can use it again in recovering the precious metals from the ore?

\*      \*      \*      \*      \*      \*      \*

The WITNESS. Yes, sir, part of that lead which goes into slag, and this slag is thrown out. It is not recovered at all.

By Mr. FITZGIBBON.

X Q. What is the percentage of lead in that slag?—A. About one to two per cent.

X Q. But all the rest of the lead is recovered and used over again as a collector for other precious metals, is it not?—A. Yes, sir.

X Q. Now, if the silver sulphate ore which you originally purchased—rather, silver sulphide—did not have a high content of lead, you would have to purchase more pig lead in order to recover your silver and precious metals?

\*      \*      \*      \*      \*      \*      \*

The WITNESS. Yes, we would have to add more metal to it.

\*      \*      \*      \*      \*      \*      \*

X Q. So that because this sulphide ore, silver sulphide, has a high content of lead, it is only necessary for you to add a small amount of lead, pig lead, is that right?—A. Yes, sir.

\*      \*      \*      \*      \*      \*      \*

X Q. In the recovery process, you do report how much lead is recovered, do you not?—A. Yes, we analyze everything at the end of the year on all the products that we have on hand.

On redirect examination the witness testified in part as follows:

R Q. Mr. Meyer, you said in answer to some questions on cross-examination that some of the lead is recovered. That is, it is used over again. Is it recovered as the final product of the smelting and refining operation, or is it recovered as an intermediate step?—A. Intermediate step.

R Q. This lead keeps diminishing as it goes through the process?—A. Yes, sir.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

R Q. Do you ever have more lead on hand than at the beginning?—A. Always a loss. \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

R Q. The lead that results is an intermediate product, only a collector?—A. Yes.

R Q. And eventually that is used up and disappears in one form or another?—A. Yes, sir.

On recross-examination the witness testified in part as follows:

R. X Q. In your smelting process to recover silver and gold from the silver sulphide, it is necessary to use lead, is it not?—A. Yes, sir.

R. X Q. And the lead that is in the ore, as imported, is recovered, and used over again as part of the process, is it not?—A. Yes, sir.

Upon this record I find the following facts:

(1) That the merchandise at bar consists of silver sulphide ore containing 33.37 per centum of lead.

(2) That the lead in the imported ore is paid for by the importer.

(3) That after importation the silver sulphide ore is smelted in a test furnace, some pig lead being added to it.

(4) That after that process is completed the lead that was in the ore, together with the added lead, runs off as litharge lead oxide, the residue in the furnace consisting of silver.

(5) The litharge lead oxide is then taken to a blast furnace where it is used in the recovery of precious metal from jewelers' sweepings.

(6) That in the first process mentioned some of the lead in the sulphide silver ore, as well as some of the pig lead goes up into the flue as dust, and is collected and taken to the blast furnace and like the litharge lead oxide is used in the recovery of precious metals.

(7) That the lead in the silver sulphide ore is then used as a collector, greatly diminishing until an exceedingly small residue is thrown out as slag.

(8) That the lead, although recovered for smelting purposes, is not sold as lead.

In his complete and exhaustive brief, counsel for the plaintiff contends that the lead in the silver sulphide ore at bar is not actually recovered within the meaning of the paragraph 391 of the Tariff Act of 1930, arguing that the words "actually recovered" mean actually recovered commercially.

With this contention we are inclined to agree not only on the

ground of the common meaning of the words "actually recovered" but also because of the congressional history of said paragraph 391.

So far as here pertinent, paragraph 392 of the Tariff Act of 1922 reads as follows:

Lead-bearing ores and mattes of all kinds, 1½ cents per pound on the lead contained therein: *Provided*, That such duty shall not be applied to the lead contained in copper mattes unless actually recovered * * *.

At the hearing (Vol. 3, p. 2551, Tariff Adjustment 1929, 70th Congress) held before the Ways and Means Committee of the Congress pending the enactment of paragraph 391 of the Tariff Act of 1930, James L. Gerry, representing the American Smelting and Refining Co. before said committee, said in part:

When the act of 1922 was being discussed, all these industries—the lead industry on the one hand, the zinc industry on the other, and the smelting industry as a third part—agreed on the rates of duty which were to be applicable not only to lead in its various forms, but also to zinc, covering both schedules.

At that time there was an amendment inserted, which you will perceive, if you refer to paragraph 392, in relation to the lead loss in the smelting and refining of copper mattes. It was provided that whereas the duty on lead ore was to be made applicable to the lead ores, it also was applied to mattes of all kinds, including copper mattes, provided that the rate of duty should not be applicable on that that was not recovered.

We are asking for an amendment of paragraph 392 so that it shall read:

Lead-bearing ores, mattes of all kinds, and other furance products and residues, 1½ cents per pound on the lead contained therein: *Provided*, That such duty shall not be applied to the lead contained in copper, gold, or silver ores, copper mattes, and other furnace products or residues unless actually recovered.

The object of that is that the copper ore is to-day on the free list. The same is true with respect to silver ore and gold ore. If, in the smelting and refining of these ores there is total destruction of the lead or zinc, as is true, then the ultimate result is that you are not assessing a duty on lead or zinc, but you are assessing a duty on gold ore or silver ore, or copper ore, which obviously was not the intent of Congress.

In support of the change in the law which, so far as here pertinent was subsequently enacted into law in paragraph 391 of the Tariff Act of 1930, the witness Gerry, both at the hearing and in his brief filed with the Committee, cited the case of *Brown* v. *Maryland*, 12 Wheat. 419, and quoted from Chief Justice Marshall's opinion therein the following language:

* * * Sale is the object of importation, and is an essential ingredient of that intercourse, of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right, not only to authorize importation, but to authorize the importer to sell. If this be admitted, and we think it can not be denied, what can be the meaning of an act of Congress, which authorizes importation, and offers the privilege for sale, at a fixed price, to every person who chooses

to become a purchaser? How is it to be construed, if an intent to deal honestly and fairly—an intent as wise as it is moral—is to enter into the construction? What can be the use of the contract, what 'does the importer purchase, if he does not purchase the privilege to sell? What would be the language of a foreign government, which should be informed, that its merchants, after importing according to law, were forbidden to sell the merchandise imported? What answer would the United States give to the complaints and just reproaches to which such an extraordinary circumstance would expose them? No apology could be received, or even offered. Such a state of things would break up commerce. * * * We think, then, that if the power to authorize a sale, exists in Congress, the conclusion that the right to sell is connected with the law permitting importation, as an inseparable incident, is inevitable.

Upon the established facts and the law applicable thereto we hold that the lead contained in the present silver sulphide ore is entitled to free entry under paragraph 391 of the Tariff Act of 1930 as not actually recovered, as alleged by the plaintiff. That claim is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.